UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
_____

ARMA, s.r.o.,                                    )
                                                 )
                        Petitioner,              )        **PETITION TO**
                                                 )        **VACATE**
            - against -                          )        **ARBITRATION AWARD**
                                                 )
BAE SYSTEMS OVERSEAS, INC.                       )        1:13-cv-494
                                                 )
                        Respondent.              )
_____)

     Petitioner, ARMA, s.r.o., by and through its attorneys, DILWORTH PAXSON LLP and

DAVIDOFF HUTCHER & CITRON LLP, respectfully states:

### THE PARTIES

     1.     Petitioner, ARMA, s.r.o. ("ARMA" or "Petitioner") is a small, family owned

business located in Slovakia, whose principal office is located at Hlvana 62, 946 56 Dulovce,

Slovakia.

     2.     Upon information and belief, Respondent BAE Systems Overseas, Inc. ("BAES"

or "Respondent") is an American corporation duly organized and existing under the laws of the

State of Delaware, with a place of business located at 450 Pulaski Road, Greenlawn, New York

11740.

### SUMMARY OF THE CASE

     3.     ARMA is a privately owned business in Slovakia which, although relatively

small, has historically strong political affiliations with the Slovak government and elsewhere in

Eastern Europe.

     4.     Beginning in or about 1999, BAES, an American-based military defense

contractor, hired ARMA as its representative to establish a presence for it in parts of Eastern

Europe, including in Slovakia.  The sole purpose of the parties' relationship was for ARMA to make inroads with various governmental entities on behalf of BAES, so that BAES could expand its business in that region.

5.      In or about mid-2005, the International Acquisition Office of the Slovak Ministry of Defense ("MOD") commenced an international public tender process to supply a mobile communications system for its armed forces, known as MOKYS.  It was estimated that the MOKYS tender would result in the award of a contract worth nearly €200,000,000.00 (Euros) to the successful bidder.

6.      As BAES' representative in Slovakia, it was ARMA's primary, if not sole, responsibility to assist BAES in winning the public tender for the MOKYS Programme.  To that end, the parties entered into an International Representative Agreement ("IRA"), dated October 14, 2005 which provided, among other things, that ARMA would be paid commissions on any "Compensable Sale" arising under the IRA.  Since winning the public tender for the MOKYS program was the goal of BAES' retention of ARMA, there can be no doubt that at the time the parties entered into the IRA, it was understood that ARMA would be paid commissions on the entirety of the MOKYS program if BAES were to become the successful bidder.

7.      In fact, the IRA contained a rather generic "survival clause" which ensured its entitlement to commissions on the entirety of the MOKYS Programme (should BAES be awarded the contract) as follows:  "Upon such expiration of this Agreement, [BAES] shall continue to pay commissions only on Compensable Sales" (the "Commission Survival Clause").

8.      It is undisputed that ARMA was successful in that BAES was declared the successful bidder and, on December 15, 2005, BAES and MOD entered into an Agreement on Future Delivery of Work No. 25/561 (the "AFDW") for the MOKYS Programme.

9.     The AFDW was a comprehensive and extremely complex agreement which provided for the implementation of the entire MOKYS Programme through the entry into several separate purchase orders called "Contracts for Work".  The scope of work provided in these separate Contracts for Work was specifically contemplated in the AFDW, and was the implementation methodology for the entire MOKYS Programme.  For example, while the AFDW specifically contemplated that, *inter alia*, BAES would prepare project documentation, would assemble prototypes, would deliver and install all parts of the individual nodes, would configure a wireless network in accordance with technical specifications referenced in the AFDW and would provide training for the completed project, these separate tasks were effectuated through the entry of a Contracts for Work between BAES and the MOD.  To eliminate any issue with regard to the parties' obligations under the AFDW, it also included a clause **requiring** BAES to enter into the Contracts for Work within thirty (30) days of a demand from the MOD.  In exchange for providing the goods and services contemplated under the AFDW, the MOD would pay BAES an agreed price in an amount estimated to be €200,000,000.00 (Euros).

10.     BAES paid commissions to ARMA under the IRA for the first three purchase orders made by the MOD under the AFDW, representing a small fraction of the entire MOKYS Programme.  In early 2008, however, following an indictment for corruption in its arms deals on a global scale, BAES began terminating all of its International Representative Agreements, including the IRA with ARMA.  Thereafter, although BAES continued to fill orders placed by the MOD under the AFDW, it refused to pay any further commissions to ARMA despite its obligations under the IRA.

11.     ARMA commenced the arbitration below seeking, *inter alia,* recovery of commissions owed on monies paid to BAES by the MOD under the AFDW as of the date of commencement, together with a declaration that the AFDW required BAES to pay future commissions on the entirety of the MOKYS Programme.

12.     The central issue in the proceeding below involved the parties' intent in defining what constitutes a "Compensable Sale" under the IRA.

13.     In seeking to limit the scope of the issues presented to the Tribunal to only the IRA, BAES applied its own manufactured definition of that term, an effort that it went to great efforts to preserve.  BAES' propensity to use any means possible to gain a competitive advantage revealed itself almost immediately in the arbitration.  Specifically, approximately an hour prior to the commencement of the initial telephonic scheduling conference in this case, BAES submitted a motion for summary judgment without first seeking leave of the Tribunal, which is ordinarily required insofar as the rules of the ICDR do not expressly provide for motion practice. Further, the only notice provided to ARMA of the filing was through an e-mail which counsel just happened to see prior to the start of the conference.  By its motion, BAES' intention was clearly to not only limit the scope of the issues considered by the  Tribunal, but, was predicated upon affirmative misrepresentations of fact then known only to BAES.  Ironically, as will be shown herein, BAES nefariously accomplished its goal in limiting the issues considered by the Tribunal and, thereby, curtailed ARMA's rights to obtain discovery or introduce fact testimony.

14.     Despite BAES' failure to comply with any of the appropriate rules of civility relating to motion practice, the Tribunal countenanced BAES' unethical tactics and allowed the motion over ARMA's objection.  In doing so,  the Tribunal also impermissibly limited scope of the issues that ARMA could address on the motion by: (i) first denying ARMA's request for

discovery of documents that were material and necessary for the defense of the motion; then (ii) shifting the focus of the entire proceeding to only those issues raised by BAES' motion for summary judgment; and lastly, (iii) by relying on an unverified submission made by BAES after the record was to have been closed (and denying ARMA the opportunity to reply).  These rulings ultimately operated to deny ARMA the right to a hearing on the issues raised in its statement of claim, the very purpose of the arbitration provision and, instead, the Tribunal resolved what were certainly disputed questions of fact summarily on argument without hearing any actual testimony from someone with actual knowledge of those facts.

15.     The Tribunal committed yet another fundamental error by basing the reasoning of the Final Award primarily, if not exclusively, on the hearsay statements of counsel regarding the rights and obligations of BAES and the MOD under the AFDW.  More specifically, in finding that the AFDW was not a "contract of sale" because "no provision of the AFDW required MOD to buy products or services", it is clear that the Tribunal accepted counsel's hearsay opinion that, contrary to the express language of the agreement and the governing law contained in the record, the AFDW was nothing more than a framework for possible future negotiations between BAES and the MOD, with 'no certainty that any fruit would be borne of that tree', as fact.  Simply stated, the Tribunal impermissibly adopted the argument of counsel as fact testimony without affording ARMA the right to probe the veracity of those statements by cross-examination.  Further, by doing so, the Tribunal manifestly disregarded the law by resolving questions of fact on a motion for summary judgment, rather than just identifying that such questions of fact exist.

16.     Finally, the Tribunal exceeded its powers by interpreting the AFDW under New York rather than Slovak law, as the document expressly required.

## STATEMENT OF RELIEF SOUGHT

17.     Petitioner seeks to vacate the award dated January 11, 2013 (the "Final Award") granting summary judgment to BAES and, thereby, dismissing ARMA's claims against it.  *A copy of the Final Award is annexed hereto as Exhibit "A".*  The bases for seeking vacatur of the Final Award include, but  are not limited to: (1) that the award was procured by corruption, fraud and undue means on the part of BAES; and (2) that the Tribunal was guilty of misconduct by (i) basing the Final Award, at least in part, on the unverified statements of counsel and on a false and misleading submission proffered by BAES after the record was closed, neither of which ARMA was permitted to authenticate or cross-examine; (ii)  in limiting ARMA's demand for discovery of evidence which was pertinent and material to the controversy, thereby depriving ARMA of a fundamentally fair hearing; (iii) in exceeding its powers or so imperfectly executed them by interpreting a contract under New York law, rather than under Slovak law, as was required by that contract; and (iv) in manifestly disregarded the law by, *inter alia,* deciding questions of fact on a motion for summary judgment.

18.     For all these reasons, the summary award should be vacated and the matter remanded to the Tribunal with instruction to conduct a proper hearing on competent evidence.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction over each of the parties and the subject matter of this dispute under 9 U.S.C. §301, *et seq.* insofar as the Final Award was rendered in an international commercial arbitration, notwithstanding the fact that the Final Award was rendered without actual arbitration of the dispute.

20.     Venue is proper in this District pursuant to 9 U.S.C. §10(a) insofar as the Final Award was made in Washington, D.C.

## PROCEDURAL HISTORY

21.     On November 8, 2011, ARMA submitted a notice of and demand for arbitration, together with a Statement of Claim, to the International Centre for Dispute Resolution, a division of the American Arbitration Association (the "ICDR").  *A copy of the Demand for Arbitration and Statement of Claim is annexed hereto as Exhibit "B".*

22.     On December 6, 2011, BAES submitted a Response to the demand for arbitration and answer to the Statement of Claim.  *A copy of BAES' Response is annexed hereto as Exhibit "C", without its original exhibits.*

23.     On January 13, 2012, ARMA submitted a Reply.  *A copy of the Reply is annexed hereto as Exhibit "D".*

24.     After issue was joined, a Tribunal was appointed to conduct the arbitration consisting of Mark A. Cymrot, Esq., Judith B. Ittig, Esq., and Mark R. Joelson, Esq.

25.     On March 6, 2012, the case manager for the ICDR sent a letter to the parties advising that a preliminary hearing had been scheduled for March 7, 2012, beginning at 3:30PM, EST, to be conducted telephonically.

26.     On March 7, 2012, approximately one (1) hour before the scheduled start of the preliminary telephonic hearing, and without any notice to ARMA or permission from the Tribunal, BAES filed a rather voluminous Motion for Summary Judgment.  *A copy of BAES' Motion for Summary Judgment is annexed hereto as Exhibit "E", without its original exhibits.*  Although ARMA strenuously objected to the Tribunal's consideration of the motion, arguing that the parties could prepare for a full hearing within the same time frame, BAES' motion was allowed.   Following the preliminary hearing, the Tribunal issued a Case Management Order dated March 7, 2012, directing, *inter alia,* that the parties meet and confer on the issue of whether any disclosures should be made prior to briefing BAES' Motion for Summary Judgment.  *A copy of the Case Management Order is annexed hereto as Exhibit "F".*

27.     In the Case Management Order, the Tribunal directed a further conference call to be held on April 25, 2012, to address ARMA's right to seek discovery with respect to BAES' motion, which, consistent with its stated purpose, BAES vehemently opposed.

28.     Although the parties attempted to meet and confer in accordance with the Case Management Order, counsel for BAES rejected every demand for discovery made by ARMA.  As a result, in advance of the discovery conference scheduled for April 25, 2012, the parties submitted a joint letter to the Tribunal memorializing ARMA's demands for discovery and BAES' rejections thereof.  *A copy of the joint letter dated April 20, 2012, is annexed hereto as Exhibit "G".*

29.     On April 25, 2012, the parties conducted a discovery conference with the Chairman of the Tribunal at which time ARMA's demands for discovery were addressed.

30.     April 30, 2012, the Tribunal issued Procedural Order No. 1, which denied ARMA's demands for discovery in part, and set a briefing schedule on the motion. *A copy of Procedural Order No. 1 is annexed hereto as Exhibit "H".*

31.     By letter dated June 21, 2012, ARMA requested permission to file a Cross-Motion for Summary Judgment. *A copy of ARMA's letter dated June 21, 2012, is annexed hereto as Exhibit "I".*

32.     On June 25, 2012, the Tribunal issued Procedural Order No. 2 granting ARMA's request to file a Cross-Motion and setting a further briefing schedule. *A copy of Procedural Order No. 2 is annexed hereto as Exhibit "J".*

33.     On July 3, 2012, ARMA served and filed a Cross-Motion for Summary Judgment. *A copy of ARMA's Cross-Motion is annexed hereto as Exhibit "K", without its original exhibits.*

34.     On July 24, 2012, BAES served and filed its Opposition to ARMA's Cross-Motion. *A copy of BAES' Opposition is annexed hereto as Exhibit "L", without its original exhibits.*

35.     On August 17, 2012, ARMA served and filed a Reply to BAES' Opposition. *A copy of ARMA's Reply is annexed hereto as Exhibit "M".*

36.     The Tribunal heard oral argument on the motions on October 24, 2012, at the offices of Baker & Hostetler LLP, in Washington D.C. *A copy of the transcript of the oral argument is annexed hereto as Exhibit "N".*

37.     At the conclusion of argument, the Tribunal directed the parties to submit post-hearing briefs on November 14, 2012, after which the Tribunal stated it would close the record. *See Exhibit "N" @ p. 172.* Both parties submitted their post-hearing briefs to the Tribunal simultaneously on November 21, 2012. *A copy of ARMA's post-hearing brief is annexed hereto*

as Exhibit "O", and a copy of BAES' post-hearing brief is annexed hereto as Exhibit "P", without their original exhibits.

38.     On December 3, 2012, after the record should have already been closed, BAES gratuitously submitted a letter to the Tribunal, purportedly to "complete the record", although the events described therein neither then occurred nor were certain to occur. *A copy of BAES' letter dated December 3, 2012, is annexed hereto as Exhibit "Q".*

39.     On December 7, 2012, ARMA submitted a letter to the Tribunal asking the Tribunal to disregard BAES' submission or, in the alternative, to allow ARMA to respond in kind. *A copy of ARMA's letter dated December 7, 2012, is annexed hereto as Exhibit "R".*

40.     The Tribunal issued the Final Award on January 11, 2013. *See Exhibit "A".* The Final Award granted summary judgment to BAES and dismissed ARMA's claims in their entirety.

41.     As will be more fully articulated herein, the Final Award must be set aside insofar as it was procured by fraud and undue means on the part of BAES, and was the product of misconduct on the part of the Tribunal in refusing to hear evidence pertinent and material to the controversy. As further grounds for vacatur of the Final Award, the Tribunal ignored the parties' choice of law provision and, as a result, applied the wrong law to the facts of this case.

42.     When combined, the foregoing factors resulted in the denial of ARMA's right to any hearing, let alone a fundamentally fair hearing, as well as a sufficiently imperfect execution of the Tribunal's powers that a mutual, final and definite award upon the subject matter submitted was not made.

43.     In short sum, the Tribunal's interpretation of the IRA simply cannot be correct. Specifically, under the Tribunal's interpretation, BAES could have terminated the IRA after

being awarded the AFDW but before the first Contract for Work was signed and would have owed no commissions to ARMA.  Since it is undisputed that the primary, if not only, purpose of the parties' agreement formalized in the IRA was to have ARMA assist BAES in obtaining the MOKYS Programme, the result reached by the Tribunal is entirely inconsistent with the parties' intent in entering the agreement.

44.    Although ARMA recognizes that the "correctness" of the Tribunal's decision is not, in and of itself, a sufficient ground upon which to seek its vacatur, as is set forth in greater detail hereinbelow, the record substantiates various grounds which require that this Petition be granted and the Final Award vacated.

## BACKGROUND FACTS

45.     Petitioner ARMA is a small, family-owned business located in Slovakia which provides a variety of services including, but not limited to, procuring international relationships with the governments of countries in Eastern Europe, including Slovakia, and with the native business communities.  *See Exhibit "K" @ p. 3.*

46.     Respondent BAES is a corporation duly organized and existing under the laws of the state of Delaware and is the contracting arm for international representative agreements on behalf of BAE Systems, Inc., a U.S. based enterprise that primarily designs, manufactures and sells defense related products and services throughout the world.  *Id.*

47.     The parties started their business relationship in the late 1990's when BAES hired ARMA as its representative to establish a presence for BAES in parts of Eastern Europe, including in Slovakia, with the hope of expanding its business.  *See Exhibit "M" @ p. 4.*

### A.   The MOD Announces the Public Tender of MOKYS

48.     In 2005, the International Acquisition Office of the Slovak Ministry of Defense ("MOD") commenced an international public tender process to supply a NATO-compliant mobile communications system for its armed forces, known as the MOKYS Programme.  The Rules of the Public Tender ("RPT") were published by the MOD on July 7, 2005, under Section 281 *et seq.* of the Slovak Commercial Code.  *A copy of BAES' Uncertified Translation of the RPT, prepared by its then-attorney, Allen & Overy, LLP, is annexed hereto as Exhibit "S".*  The RPT provided, *inter alia,* that the process of the public tender would be divided into four (4) distinct parts, *to wit*: (i) prequalification; (ii) submission of the proposed solution of the subject matter of the tendered obligation; (iii) demonstration of the functionality of the subject matter of the tendered obligation; and (iv) price offer.  *See id. @ p. 4.*  The RPT further provides, *inter*

*alia,* that the successful bidder will enter into a Contract for Future Work with the MOD, under Section 289 of the Slovak Commercial Code. *Id. @ p. 3.*

49.     As the parties had an existing relationship, BAES retained ARMA, who it described in this proceeding as a "thirty thousand foot advisor", specifically to "open the lines of communication" with the MOD and to "provide intel to [BAES] about the business conditions in Slovakia and the state of things in the defense industry" for the purpose of attempting to "win business" for BAES. *See Exhibit "C" @ p. 14, Exhibit "N" @ p. 17-19.*

50.     As a direct result of ARMA's influence, BAES was included in the tender process for MOKYS.

51.     It was a rather competitive bidding process, with seventeen (17) of the largest military defense contractors competing for the tender, which included four (4) elimination rounds with companies such as Harris Corporations (USA), General Dynamic (USA), Selenia Communications (Italy), Taderan (Israel) and Thales Communications (France). *See Exhibit "M" @ p. 4.*

### B.   ARMA and BAES Enter into the IRA

52.     After having submitted the necessary documents to demonstrate its qualifications to participate in the tender process, but prior to submitting its formal bid, BAES and ARMA entered into an International Representative Agreement ("IRA") dated October 14, 2005, to memorialize their relationship. *A copy of the IRA is annexed hereto as Exhibit "T".* The IRA is a standard form contract that BAES uses with all of its international representatives (*see Exhibit "N" @ p. 50*) and provides that the agreement is to be governed by and construed in accord with New York law (*see Exhibit "T" @ ¶17*).

13

53.     It is significant to note that in addition to the standard language contained in all its international representative agreements, BAES insisted on including express language in the IRA specifically prohibiting ARMA from dealing directly with the actual sale of BAES' products and services and, further, banned ARMA from any meetings at which such matters were discussed.   Indeed, ARMA's role was limited, by definition, to creating a relationship between BAES and the MOD, so that BAES would be awarded the AFDW.

54.     In that the public tender process was moving quickly, BAES' representatives pressured ARMA into signing the IRA, which they described as a "mere formality", as quickly as possible.   As was stated above, ARMA did not have the opportunity to have U.S. counsel review the IRA prior to signing it.

### i.   ARMA's Role Under the IRA

55.     The purpose of the IRA is set forth in the "General Terms and Conditions" wherein it is stated that BAES appointed ARMA "to assist [it] in the marketing and sale … of the Products and Services in the [Slovak Republic] to the [Government of the Slovak Republic and the MOD]. *See Exhibit "T" @ ¶1.A.*   The IRA further provides, *inter alia,* that ARMA will be paid commissions on any "compensable sale", which is defined at Section 4.C as follows:

> [A] "Compensable Sale" means a transaction that is formalized in an unconditional sales contract with the following pre-conditions met:
>
> During the term of this [IRA] …
>
> [ARMA] initiated, promoted and developed said transaction; and
>
> [BAES] received, accepted and signed a contract of sale for … which a sale contract becomes binding on the parties during the term of this [IRA] … ; and
>
> The Products sold under the Contract are for the sole use of the Customer [the MOD] in the Territory.

*See, e.g., Exhibit "T" @ ¶4.C.*

56.     As will be discussed further *infra,* the core issue was the proper interpretation of the Section 4.C of the IRA concerning the definition of a Compensable Sale.  In sum, BAES argued that the requirements of a "contract of sale" or "sales contract" in Section 4.C is plain and unambiguous and, therefore, should be accorded its ordinary meaning under New York law. In response, ARMA agreed that New York law governed the IRA, however, it disagreed with BAES' construction of Section 4.C arguing that when the IRA is read as a whole, it is clear that these terms could not possibly have the meaning ascribed to them by BAES since other references to "sales contracts" in the IRA would be inconsistent with that definition.

### ii.   The IRA's Restrictions on ARMA

57.     Although the IRA required ARMA to 'initiate, promote and develop' the transaction resulting in a Compensable Sale, it also clearly prohibited ARMA from having any contact with the MOD after the AFDW was signed.  Specifically, Section 3.C of the IRA provides that

> [ARMA] will not contact any customer or perform any services unless [ARMA] has received such direction from [BAES] or from the Agreement Monitor

*See Exhibit "T" @ Section 3.C*

58.     In addition, Section 3.B of the IRA provides that ARMA is not authorized to negotiate or execute contracts for BAES.  *Id. @ Section 3.B.*

59. Most significantly, however, Appendix "A" of the IRA provides:

[ARMA] *will not*, during the term of the [IRA], *participate in business meetings* with the [Government of the Slovak Republic and the MOD] … and in particular with the Slovak Government's procurement authorities, *where the acquisition of the Products and Services is discussed, nor in negotiations related to any sale contract for the Products or Services*

*Id. @ Appendix "A".* (Emphasis added).

60. As a result of these restrictions, it should have been clear that the term "contract of sale" as used in Section 4.C of the IRA is not a reference to the Contracts for Work.

**C. The AFDW and Slovak Law**

61. With ARMA's help, BAES ultimately prevailed as the successful bidder in the tender process and secured the contractual rights to provide the entirety of the MOKYS Programme to the MOD.  After announcing BAES as the successful bidder, BAES and the MOD negotiated and entered into the AFDW as required by the RPT.  *A copy of the AFDW is annexed hereto as Exhibit "U".*  The AFDW provides that the subject matter of the agreement is

the obligation of the Future Supplier [BAES] to enter into contracts for work whose subject matter is the obligation of the Future Supplier to deliver the work and material, to perform the works and installation and to provide the services and service within the implementation of individual tasks of the project [MOKYS]

*See id. @ ¶3.1.*

62. The AFDW obligates BAES to not only sell its Products to the MOD, but, to prepare the Program documentation, install materials, configure the system, train the user's operators, prepare technical documentation, prepare certifications, and implement the system. *See id. @ ¶ 3.1.1 - 3.1.18.*  The AFDW contains a clause stating that the agreement is to be governed by Slovak law and, although the document was prepared in both the English and

Slovak languages, it provides that if there is a dispute or discrepancy between the English wording and Slovak wording, the Slovak wording will prevail. *See Exhibit "U" @ ¶¶8.4, 8.9.*

63.     After executing the AFDW, BAES publicly touted its commitment to the "offset program", whereby as a condition precedent of being awarded the MOKYS tender, it was required to make an equivalent investment to the Slovak economy, further evidencing its obligations under and the binding nature of the AFDW.

### D. **The Contracts for Work**

64.     On or about May 9, 2006, ARMA and the MOD signed two Contracts for Work ("C1" and "C2") under the AFDW, thereby beginning the process of implementing the MOKYS Programme. *See, e.g., Exhibit "M" @ p. 9.* BAES paid ARMA the commissions due on C1 and C2 as is required under the IRA.

65.     Later that year, on or about December 15, 2006, ARMA and the MOD signed an additional Contract for Work ("C3"), furthering the build-out of the MOKYS Programme. At or about this time, however, BAES had come under investigation for its alleged use of political corruption to help sell arms to Chile, Czech Republic, Romania, Saudi Arabia, South Africa, Tanzania and Qatar. Although BAES denied those allegations, in or about June, 2007, the "Woolf Commission" was established to conduct a full investigation of BAES' ethical practices in its arms deals. As a result, BAES only paid ARMA part of the commissions due it for C3.

66.     BAES allowed the IRA to expire as of March 30, 2008, although it extended the AFDW with the MOD by "Supplement No. 1" dated December 28, 2009. *See Exhibit "U".* Thereafter, BAES continued to enter into succeeding Contracts for Work with the MOD under the AFDW ("C4") on or about June 2, 2010.

67.     ARMA submitted an invoice for payment to BAES for C4 which BAES refused to pay despite the express Commission Survival Clause of Section 6 of the IRA.

68.     As a result of the foregoing, ARMA filed a demand for arbitration seeking to recover payment due it for C4, as well as for a declaration that BAES is obligated to pay ARMA commissions on all orders placed by the MOD under the AFDW.  Unfortunately, ARMA was denied its "day in court" as the Tribunal resolved disputed questions of fact after hearing oral argument on BAES' motion for summary judgment without the benefit of hearing any witnesses or testimony.

## THE ARBITRATION

69.     ARMA's claims in its demand for arbitration focused on the fact that ARMA was hired to act as BAES' representative for the purpose of getting it the tender for the MOKYS Programme, which it did when BAES won the award and signed the AFDW with the MOD.  It was ARMA's position that, pursuant to the IRA, once BAES was awarded the contract with the MOD, it was entitled to be paid commissions on the full value of the MOKYS Programme. ARMA also argued that if BAES were not required to pay commissions to ARMA on the entirety of the MOKYS Programme, BAES would be unjustly enriched at ARMA's expense. Accordingly, ARMA's claim asserted that since its responsibility was to assist BAES in obtaining the AFDW, it was the only "Compensable Sale" under the IRA.  Further, ARMA argued that the Contacts for Work were only determinative of when commissions were due to ARMA, but not when or whether they were *earned* under the IRA.

### A. BAES Files a Motion for Summary Judgment in Bad Faith

70.     Immediately prior to the initial scheduling conference, without seeking permission from the Tribunal and without providing any notice to ARMA, BAES improperly

filed a motion for summary judgment arguing that ARMA's claims must be dismissed as a matter of law because the AFDW purportedly does not fit the definition of a "Compensable Sale" as is set forth in paragraph 4.C of the IRA. In arguing that the Tribunal should permit the motion, BAES averred that the motion was based squarely within the four corners of the IRA and, further, would only require the Tribunal to consider and opine on issues of law.  Over ARMA's objection, premised in part on the fact that a hearing could take place within the same or similar time frame, the Tribunal resolved to consider BAES' motion on its purported merits and, consequently, denied ARMA the opportunity to proceed to the very hearing contemplated in the arbitration provision contained in the IRA.  In addition to denying ARMA a hearing, by agreeing to limit its consideration of the issues to only those framed by BAES in its motion, rather than all those set forth in ARMA's Statement of Claim, the Tribunal deprived ARMA of the very rights for which it bargained - a full and fair hearing at which time its claims would be heard.

### B.  The Tribunal's Denial of Relevant Discovery

71.    During the initial scheduling conference, the Tribunal presented the question as to whether ARMA should be permitted to conduct any discovery in response to or in connection with BAES' motion.  In response, ARMA contended that discovery was both appropriate and necessary.  Not surprisingly, BAES obstreperously maintained that ARMA was entitled to no discovery.  As the parties could not agree on ARMA's right to conduct discovery, the Tribunal issued a Case Management Order directing them to meet and confer in an effort to narrow, if not resolve the discovery issues.  *See Exhibit "F".*

72.    Following issuance of the Case Management Order, counsel for ARMA compiled a list of discovery demands and attempted to confer with counsel for BAES in good faith with

regard to the production of certain relevant information.  Once again, BAES refused to confer in good faith and fastidiously maintained that ARMA was entitled to no discovery.

73.     As the parties were unable to resolve their dispute as to discovery, they submitted a joint letter to the Tribunal dated April 20, 2012, which outlined ARMA's discovery demands and BAES' responses thereto.  *See Exhibit "G"*.  As the Court will see, despite the fact that ARMA was constrained to narrowly tailor and curtail its demands, BAES objected to each and every demand claiming, *inter alia,* that "the clear and unambiguous language of the IRA" was all the Tribunal needed to consider and that ARMA should be denied the right to any discovery.  *Id.* Notwithstanding this contention, BAES stated it would purportedly "conduct a reasonable search" for documents responsive to certain of the demands if and only if the Tribunal were to decide that "limited discovery" is appropriate.  *Id.* In other instances, BAES flatly refused to provide discovery responses.  *Id.*

74.     The parties conducted a telephonic discovery conference with the Chairman of the Tribunal on April 25, 2012, at which time the Chairman heard argument on the discovery dispute.  Although the Chairman ultimately granted portions of ARMA's discovery requests, he limited certain of the responses which BAES was required to provide and denied other demands outright.  The Chairman's ruling was memorialized in Procedural Order No. 1, dated April 30, 2012.  *See Exhibit "H"*. The Chairman denied certain of ARMA's demands for discovery with respect to issues that were raised in its statement of claim on the theory that those demands were not relevant to the issues before the Tribunal on BAES' motion.  Consequently, the Tribunal's decision to consider issues upon which discovery was denied and to give weight to counsel's "testimony" at oral argument in the Final Award, makes it clear that ARMA was denied the right to a fair hearing.

### C. **The Tribunal's Failure to Apply Slovak Law to the AFDW**

75.     In its Motion for Summary Judgment, BAES sought to deny ARMA's claims for commissions by defining the term "Compensable Sale" as narrowly as possible.  In so doing, BAES' argument focused solely on the language contained in Section 4.C of the IRA, which defines a Compensable Sale as follows:

> [A] "Compensable Sale" means a transaction that is formalized in an **unconditional sales contract** with the following pre-conditions met:
>
> During the term of this [IRA] …
>
> [ARMA] initiated, promoted and developed said transaction; and
>
> [BAES] received, accepted and signed a **contract of sale** for … which a **sale contract** becomes binding on the parties during the term of this [IRA] … ; and …

*See Exhibit "E" @ p. 5* (emphasis by BAES).

76.     While ARMA could not and did not dispute that Section 4.C is a critical provision in determining what constitutes a "Compensable Sale" under the IRA, it nonetheless maintained that such section cannot be analyzed in a vacuum and to the exclusion of all other clauses in the IRA.

77.     In focusing only on the foregoing language, BAES argued that only the individual Contracts for Work purportedly fit the definition of a "contract of sale" or "sale contract" as those terms are used in Section 4.C.  As a result, BAES submitted that neither C-4 nor the AFDW meet the criteria to be a Compensable Sale.  With regard to C-4, BAES contended that C-4 cannot be a Compensable Sale because, although it was purportedly a "contract of sale", it was not signed during the term of the IRA.  With regard to the AFDW, BAES argued that the AFDW is not a Compensable Sale because it purportedly does not fit the definition of a "contract of sale" because it did not "move goods from place to place in the context of a contract".  *Exhibit*

"N" @ p. 33.  For example, BAES argued that the AFDW is not a contract for sale under Slovak

law because 'the AFDW states on its face that it was entered into pursuant to Section 269 of the

Slovak Commercial Code', a general contractual provision, rather than §409 *et. seq.*, the section

specifically governing contracts of sale.  *A copy of the Slovak Commercial Code is annexed*

*hereto as Exhibit "V"*.

78.     BAES' argument in the foregoing regard was an affirmative misrepresentation to

the Tribunal insofar as Section 410(2) of the Slovak Commercial Code provides that:

> A contract of sale shall not be deemed to be a contract under which a major
> part of the obligation of the party which is to deliver the good consists of
> performing only a certain activity or of assembling the goods.

*See Exhibit "U" @ §410.*

79.     Accordingly where, as here, a significant portion of the subject matter of the

AFDW was for the provision of services, it was incapable of being governed by Chapter 2, Part I

of the Slovak Commercial Code which governs contracts of sale.

80.     In addition, BAES' own (albeit unofficial) translation of the RPT noted that the

reference to Section 269 of the Slovak Commercial Code was likely an error, and that the

reference should have been to Section 289, which sets forth a specific statutory construction of

an "agreement to conclude a future contract".  Notwithstanding the foregoing, BAES rejected its

own counsel's contention and steadfastly maintained that only the individual Contracts for Work

satisfied the definition of a "sales contract" under the IRA.

81.     BAES also argued that even though the AFDW is expressly governed by Slovak

law, it could not be considered a contract of sale under New York law because it purportedly

lacked the requisite terms such as 'term', 'price' and 'place of performance', necessary to qualify

as a contract of sale under New York law.  *See Exhibit "E" @ p. 9.*  This argument affirmatively

misrepresented the facts to the Tribunal insofar as BAES and the MOD were specifically *required* to agree to a price term as the final component of the tender process. Even more egregious is the fact that BAES was aware that price terms were set forth on a separate Attachment 1 to the AFDW, and that technical specifications were set forth on a separate Schedule 2 to the AFDW. BAES did not attach these Schedules to the copy of the AFDW annexed to its motion, asserting that the Schedules were highly confidential documents and that their contents could not be disclosed. Ultimately, at the hearing, the Tribunal forced BAES to admit that Schedule 1 included binding price terms, thereby revealing BAES' misconduct during the discovery process. Regardless of whether BAES' contention was disingenuous or intentional, the fact is that BAES used the excuse of confidentiality to affirmatively misrepresent the facts in its motion.

82.     In response to the motion, ARMA submitted that BAES' argument must fail because, *inter alia,* BAES' interpretation of what constitutes a "Compensable Sale" under the IRA limited its focus solely on one subclause of that agreement, reading it to the absolute exclusion of all other sections. More specifically, ARMA argued that when the IRA is read as a whole, it is clear that the term "sales contract" as used in Section 4.C could not have the meaning ascribed to it by BAES.

83.     For example Section 4.C.2 of the IRA required ARMA to 'initiate, develop and promote' the transaction that resulted in the relevant sales contract. In order to "initiate" a contract, ARMA would have to "commence, start, originate [or] introduce" the contract. To "promote" a contract, ARMA would have to contribute to its growth or enlargement, and to "develop" a contract, ARMA would have to build up or expand it.

84. ARMA similarly argued that the Contracts for Work could not form the basis of a Compensable Sale under the IRA as BAES contended because when the IRA is read as a whole, one will see, *inter alia* that:

> [ARMA] will ***not***, during the term of the [IRA], ***participate in business meetings with the [Government of the Slovak Republic and the MOD]*** … and in particular with the Slovak Government's procurement authorities, ***where the acquisition of the Products and Services is discussed, nor in negotiations related to any sale contract for the Products or Services***

*See Exhibit "T" @ Appendix "A".* (Emphases added)

85. As a result, it was simply not possible for ARMA to have 'initiated, promoted or developed' any of the individual Contracts for Work.

86. In addition, Section 5.C of the IRA provides:

> For purposes of Commission calculations, the dollar values of all Products and Services ***ordered under*** a sales contract (***whether ordered initially or added subsequently via formal amendment of the contract or by a separate purchase order***) are cumulative (i.e., if a sales contract includes options for additional Products and such options are exercised by Customer, the base and optioned quantities are cumulative for purposes of calculating the applicable Commission).

*See Exhibit "L" @ p. 21* (Emphases in original).

87. ARMA therefore submitted that only the AFDW comports with the definition of a Compensable Sale. ARMA based its position on the theory that commissions could only be "cumulative" under the AFDW, which specifically contemplates the use of successive Contracts for Work in order to complete the MOKYS Programme. Conversely, none of the individual Contracts for Work possess any attributes by which sales could be cumulative.

88. Moreover, the AFDW was the only contract that ARMA could conceivably have been in a position to initiate, promote and develop, given the express limitations of the IRA.

89. ARMA's point was proven at oral argument when BAES' counsel admitted that ARMA was "not hired to do the negotiations of individual sales contracts with … the customer".

*See Exhibit "N" @ p. 22.* Indeed, BAES' counsel also stated that "BAES was working with its partners there in Bratislava … to … pursue what's known as an agreement for future delivery of work …" *See Exhibit "N" @ p. 17.*

90.     Although counsel acknowledged that the purpose for which BAES hired ARMA was to get it the AFDW, she was undeterred in disingenuously maintaining that the "Compensable Sale" described in Section 4.C was intended to mean the Contracts for Work, despite the fact that ARMA was contractually prohibited from participating in the negotiations for any such contract(s).

91.     In trying to navigate BAES' argument, the Tribunal then asked "[h]ow do they [ARMA] promote and develop a transaction on the one hand and not participate in any meetings on the other hand?" *Id. @ p. 23.* Counsel responded by saying

> [w]hat they mean by initiating, promoting and developing the sales contract is that they are providing the background intel …
>
> PR is not the right way to phrase it, but they are promoting the impression that the in-country persons that BAES had to deal with, they're promoting a good impression of BAES

*Id. @ p. 23-24.*

92.     The incongruity of BAES' argument should have been exposed at that point, wherein it could be readily seen that BAES was urging the Tribunal to find that the use of the terms "initiate, promote and develop" in the IRA did not have their ordinary meaning, while simultaneously arguing that the term "contract of sale" purportedly did.

93.     In trying to sort through the machinations of BAES' argument, the Tribunal asked, "[w]hat did [ARMA] do for C-2 to satisfy the provisions of the IRA?  Give me a specific example." *See Exhibit "N" @ p. 25.* As no specific example could possibly be given, BAES' counsel merely referred the Tribunal to one of ARMA's invoices saying

It describes the work.  It describes the status of future contract awards.  It describes the reputation of [BAES] in that country, and it talks about, you know, work that it's doing to initiate, promote and develop transactions … ARMA's role was is [sic.] that, to help foster the condition in the country

*Id, @ p. 26.*

94.     Notwithstanding its ultimate decision, the Tribunal appeared to understand the inherent inconsistency in BAES' position, when it inquired as follows:

TRIBUNAL:        Of course, that's not what the language says.

TUFFIN:          Pardon?

TRIBUNAL:        I said, of course, that's not what the language says. It
                 says initiate, promote and develop said transaction,
                 namely, the compensable transaction.

*Id. @ 27.*

95.    The Tribunal then asked if ARMA initiated, promoted or developed the AFDW.

Again unable to respond with a direct answer, the following exchange took place:

TUFFIN:          No.  I mean the AFDW was signed two months after the
                 IRA was signed, so, the AFDW was already in process
                 before this IRA was actually executed.

                 …

                 We thought that working with them was going to assist us
                 in achieving what we knew was going to be necessary.

                 …

                 I don't want to diminish what they did.  Obviously we think
                 that they performed

                 …

                 we, BAES, expected them to perform the level-one services
                 that I described before

TRIBUNAL:        *(By Joelson)* I'm sorry, let me be more specific.  Did
                 ARMA initiate, promote and develop the AFDW or any of
                 the contracts with them?

                 ….

TUFFIN:          It was performing it's [sic.] level one service and helping
                 create the special sauce, so to speak, that allowed these
                 contracts to come into existence.

TRIBUNAL:        *(By Joelson)* I'd really like a yes or no answer.  Obviously
                 if you think I'm trying to trick you, which I'm not, you can
                 refuse to answer.

|  | The question is, did ARMA initiate, promote and develop the AFDW or any contract within? |
|---|---|
| TUFFIN: | Right, and I answered - - I thought I was answering that yes they did, but they were not the sole entity that did that. |
| TRIBUNAL: | (*By Joelson*) I've got it. You have answered my question. Thank you so much. |
|  | (*By Cymrot*) Wait, let me just stay with that.  Did [ARMA] initiate, promote and develop the AFDW? Forget about the three contracts, just the AFDW? |
| TUFFIN: | Well, the AFDW is a separate thing from the actual contract. |
|  | … |
| TRIBUNAL: | (*By Cymrot*) Did [ARMA] initiate, promote and develop the AFDW in any respect? |
| TUFFIN: | Well, I mean, they did what they do.  So, I have to say yes. Yes. |

*Id. @ p. 27 - 31.*

96.     As a result of BAES' reluctant admissions, ARMA asked the Tribunal to find that the AFDW was the only Compensable Sale under the IRA and that the individual Contracts for Work were not.  Attendantly, ARMA asked the Tribunal to find that ARMA was entitled to be paid commissions on all Contracts for Work ordered by the MOD under the AFDW.

### D.  The Tribunal Wrongfully Considered Counsel's Argument as Testimony

97.     At the conclusion of oral argument on the motions, the Tribunal stated that it would permit the parties to submit post-argument briefs, limited to ten (10) pages, addressed to very specific points, including the authority of the Tribunal to award attorneys' fees.  *See, e.g., Exhibit "N" @ p. 169.*  The Tribunal was very clear in stating that the submissions were to be simultaneous, that there would be no replies, and that there was not to be any repetition of arguments already briefed.  *See, e.g., id. @ p. 169-172.*  The Tribunal then stated that, after

receipt of the post-argument submissions, it would close the record. *Id.* The Tribunal's mandate proscribing the scope of the parties' post-argument submissions operated to further limit ARMA's right to address the issues it would have otherwise presented in its case-in-chief.

98.     The parties' post-argument submissions were made simultaneously on November 21, 2012. *See, e.g., Exhibits "O" and "P".* Notably, in its post-argument brief, ARMA specifically asked the Tribunal to disregard any of the "testimony" offered by BAES' counsel at oral argument concerning MOD's obligations under the AFDW (or the purported lack thereof) and/or the negotiations purportedly arising thereunder, as ARMA could not cross-examine the "testimony" of counsel. *See Exhibit "O".* ARMA submitted that if any such statements are to be considered, it must be afforded the opportunity to cross-examine any witness for BAES and to present its own witness(es). Unfortunately, the Tribunal elected to treat counsel's argument as fact testimony, as is evidenced by its reasoning in the Final Award. More troubling, however, it has since been discovered that the statements offered by counsel at oral argument concerning the parties' understanding of 'what MOKYS would look like' and the respective obligations of BAES and the MOD were intentionally misleading and false or, at minimum, were made by counsel with reckless disregard for the truth.

99.     After the parties' post-argument submissions were made, on December 3, 2012, counsel for BAES gratuitously sent a letter to the Tribunal, again without permission or notice, "for the purposes of updating the record". *See Exhibit "Q".* Counsel's letter stated that it had purportedly come to her attention that the MOD was allegedly "considering the purchase of radios, not manufactured by BAES, for use/integration within the MOKYS platform". *Id.*

100.    Upon information and belief, counsel's letter was intended to clandestinely mislead the Tribunal by exploiting a question that the Tribunal had as to what obligations, if any, the MOD had under the AFDW to BAES.  More specifically, at oral argument, the Tribunal stated its opinion that BAES was obligated to make sales to the MOD under the AFDW, but that it could not discern whether the obligation was reciprocal.

101.    For example, after hearing counsel describe the AFDW as being nothing more than an "agreement to agree", the following exchange took place:

TRIBUNAL:   (*by Joelson*) So this is an agreement to agree with no legal consequences?  Is that what you're saying?

The AFDW is an agreement to agree, with no legal obligations, other than negotiating negotiations?  Is that what you're saying?

TUFFIN:     That's right.  That's right.

TRIBUNAL:   (*by Cymrot*) It doesn't say that.

(*Ittig to Cymrot*)  Well, I'm not sure about that, because we know that there are distinctions in the words "must", "will", "shall", "may".  This is a "will" not a "shall".

So, it sounds like they want to do it, and they will do it, but they may not have to do it.

*See Exhibit "N" @ p. 37.*

102.    In discussing this point later with counsel for ARMA, the Tribunal was directed to Section 289 of the Slovak Commercial Code, governing "An Agreement to Conclude a Future Contract".  Specifically, that statute provides "[a] pledge to conclude a future contract shall bind one or both parties to conclude, within a certain time, a contract whose subject-matter shall be at least generally specified."  *See Exhibit "V" @ §289.*  In response, the Tribunal stated "I don't understand the meaning of that in this context, one or both parties …"  *See Exhibit "N" @ p. 117.*

103.    In light of the foregoing, it is believed that the only purpose of BAES' post-closing letter was to have the Tribunal conclude that the MOD was not obligated to BAES under the AFDW.

104.    By letter dated December 7, 2012, counsel for ARMA wrote to the Tribunal responding to BAES' letter questioning how BAES' unauthenticated letter regarding a future possibility could serve to complete the already substantial record in this matter.  Consequently, counsel for ARMA asked that BAES' letter be disregarded or, in the alternative, that ARMA be permitted to respond in kind.

105.    The Tribunal did not respond to ARMA's submission, leading it to conclude that BAES' letter had been rejected as requested.  Unfortunately, when the Tribunal issued the Final Award, it acknowledged receipt of BAES' letter and incorporated it into the record.  As is demonstrated by its reference to the letter in at least two instances, the Tribunal accepted the letter for the truth of the uncorroborated matters asserted without affording ARMA the opportunity to cross-examine the contents of the letter or to respond in kind, and relied on it in rendering the Final Award.

106.    As it turns out, upon information and belief, the alleged "manufacturer" referenced in counsel's post-submission letter is, in reality, the very same manufacturer BAES utilized in performing C-1, a Contract for Work that they, admittedly, owed ARMA commissions on.  In light of this fact, it becomes instantly clear that there was no true purpose for such a cryptic missive, other than BAES' intention to mislead the Tribunal.

107.    As will be discussed more fully herein, in considering the issues resulting in the issuance of the Final Award, the Tribunal was affirmatively misled by counsel for BAES as to the facts from the argument in the record; manifestly disregarded the law by interpreting the

contract in favor of the drafter, rather than against it; and, exceeded its authority by applying New York law to the AFDW, rather than Slovak law. These issues, and other specific objections to the Final Award will be discussed below.

## THE FINAL AWARD

108. In rendering the Final Award, the Tribunal correctly found that ARMA was instrumental in procuring the AFDW for BAES. This fact was undisputed. Nonetheless, the Tribunal incorrectly concluded that while the AFDW satisfied all the elements of being a valid contract under New York law, it was not a Compensable Sale because it does not satisfy the definition of an "unconditional sales contract", which it held to be "a contract for [sic.] sale for Products or Services to a customer." *See Exhibit "A" @ p. 9.*

109. The Tribunal erred in its interpretation of this contractual language for a variety of reasons which include, but are not limited to, the fact that: (i) its finding that only the Contracts for Work are "unconditional sales contracts" renders many of the other clauses of the IRA meaningless; (ii) its finding that only the Contracts for Work are "unconditional sales contracts" failed to consider the intent of the parties when entering into the IRA; and (iii) it failed to construe the language of the IRA (including any ambiguity) against BAES as the drafter of the IRA.

110. Moreover, the Tribunal's construction of the IRA cannot possibly be correct insofar as it sanctions an interpretation which would have permitted BAES to terminate ARMA after it had performed its contracted-for services but before the obligation to pay commissions arose. Stated otherwise, BAES could have been awarded the AFDW as a result of ARMA's efforts, yet it could have terminated the IRA before the first Contract for Work was signed and, by the Tribunal's logic, would have incurred no obligation to pay any commissions to ARMA at

32

all.  Surely, it is error to interpret a contract in such a way so as to eliminate the very benefit that was bargained for.

111.    As a result of the foregoing errors, the Tribunal, in rendering its decision: (i) was guilty of misconduct in refusing to allow ARMA to obtain evidence that was pertinent and material to the controversy and the motion; (ii) exceeded its powers by analyzing the AFDW under New York law when the AFDW states that it is to be governed under Slovak law; (iii) manifestly disregarded the law by resolving disputed questions of fact on a motion for summary judgment, thereby denying ARMA its right to a full and fair hearing; (iv) committed misconduct by according the argument of counsel with the weight of actual testimony; and (v) manifestly disregarded the law in finding that no provision of the AFDW required the MOD to buy Products or Services.

112.    Finally, it is noted that the Final Award was procured by undue means on the part of BAES insofar as it objected to ARMA's demands for discovery of documents in bad faith. Specifically, BAES was undeniably aware that the documents sought by ARMA were both relevant and would have aided it in defending against the allegations in BAES' motion.  As a result, BAES' sole purpose in objecting to ARMA's demands for discovery was to prevent ARMA from obtaining documentation which would have exposed BAES' misrepresentations.  A discussion of these grounds follows.

## GROUNDS REQUIRING VACATUR OF THE AWARD

### I.    LEGAL STANDARD TO VACATE AN ARBITRAL AWARD

113.    Generally speaking, a Federal Court reviewing an arbitration award will apply a deferential standard of review favoring arbitration (*see, e.g., Gulf Coast Indus. Workers Union v. Exxon Co.*, 991 F.2d 244, 248 (5th Cir. 1993); *Psarianos v. Standard Marine, Ltd.*, 790 F.Supp.

134, 135 (E.D.Tex. 1992), *aff'd*, 12 F.3d 461 (5th Cir.), *cert. denied*, 511 U.S. 1142, 114 S.Ct.

2164, 128 L.Ed.2d 887 (1994)), however, the standard is not absolute.

    114.    The relevant authority to vacate an international arbitration award is set forth at

Section 10 of the Federal Arbitration Act (*9 U.S.C. §1, et seq.*), which provides:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
>
> > (1) where the award was procured by corruption, fraud, or undue means;
> >
> > (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> >
> > (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> >
> > (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*9 U.S.C. §10.*

115.   In addition to the foregoing, several Circuit Courts have held that an arbitration award may be vacated where the arbitrators manifestly disregarded the law.  *See, e.g., Wise v. Wachovia Securities, LLC*, 450 F.3d 265 (7th Cir. 2006); *Solvay Pharmaceuticals, Inc. v. Duramed Pharmaceuticals, Inc.*, 442 F.3d 471 (6th Cir. 2006); *Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377 (5th Cir. 2004); *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Intern., Ltd.*, 888 F.2d 260 (2d Cir. 1989).

116.   In the instant case, there are numerous grounds to justify vacatur of the Final Award insofar as it was not only procured by fraud and undue means on the part of BAES, but, the Tribunal exceeded its powers in applying the wrong law to the facts, manifestly disregarded the legal standard for summary judgment, and so imperfectly executed its powers such that ARMA was denied the right to a full or fair hearing on its claims.

117.   ARMA recognizes that motions to vacate arbitration awards are generally disfavored and, further, that the standard of review is one of the narrowest recognized at law. Regardless of whether this Court finds that the facts of this case warrant the vacatur of the instant award, which ARMA believes it will, this case warrants closer scrutiny.  Here, ARMA is not contesting the determination of an arbitral panel rendered after a hearing, the purpose and intent of which was specifically contemplated when the parties agreed to the arbitration clause in their agreement.  Instead, ARMA is contesting the Tribunal's decision denying it that very right, *to wit*, a meaningful opportunity to attend a hearing at which time each party would be given the opportunity to present its case.  Despite the fact that ARMA was the Claimant, it was denied the right to conduct any discovery on its claims or to present any issues that were not squarely framed in BAES' motion.  As a result, vacatur is required in order to preserve the integrity of the arbitration process.

## II.   ARMA WAS DENIED A FUNDAMENTALLY FAIR HEARING

118.     As discussed above, ARMA was not only denied a fundamentally fair hearing, it was denied the right to any hearing whatsoever.   This was a consequence of the Tribunal's consideration and decision on BAES motion for summary judgment.   Among the concerns with regard to the use of dispositive motions in arbitrations, scholars have observed that "none of the major international arbitration rules contemplates summary judgment, at least expressly" and that "the introduction of a summary disposition mechanism raises concerns about challenges to the resulting award or its enforcement in the courts."   D. Brian King and Jeffery P. Commission, *Summary Judgment in International Arbitration: The "Nay" Case*, ABA International Law Spring 2010 Meeting, at 1 (Spring 2010).   This invites a challenge "predicated on the right of parties to have a full opportunity to present their cases, and/or the presumptive right to an oral evidentiary hearing."   *Id.*   In addition, observers have found that parties would often use such motion practice to delay the proceeding and increase costs, such as was done by BAES in the case below, which summarily defeats the stated goals of arbitration.

### A.   The Tribunal Erred in Denying ARMA Basic and Necessary Discovery

119.     In this case, the Tribunal improperly denied ARMA's requests for discovery of evidence that was material and relevant to the dispute, thereby depriving it of a legitimate opportunity to contest or contradict the purportedly factual representations made by counsel at oral argument.   This error was further compounded when the Tribunal improperly resolved disputed questions of fact on BAES' motion for summary judgment, already having deprived ARMA of the opportunity to obtain discovery which it could have utilized to contradict BAES' stated interpretation.   Accordingly, even if the proceeding before the Tribunal could be considered a "hearing", which it was not, it was fundamentally unfair to ARMA.

120.    Although a Tribunal is not required to "follow all the niceties observed by federal courts", it was required to "give each of the parties … an adequate opportunity to present [their] evidence and arguments …"  *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 878 F.Supp.2d 459 (S.D.N.Y. 2012) quoting *Tempo Shain Corp. v. Bertek*, Inc., 120 F.3d 16 (2d Cir. 1997) and *Rai v. Barclays Capital Inc.*, 739 F.Supp.2d 364 (S.D.N.Y. 2010) and citing *Bell Aerospace Co. Div. of Textron v. Local 516*, 500 F.2d 921 (2d Cir.1974).

121.    In *Tempo Shain,* the Second Circuit observed:

> Federal courts do not superintend arbitration proceedings.  Our review is restricted to determining whether the procedure was fundamentally unfair." *See Teamsters, Local Union 657 v. Stanley Structures, Inc*., 735 F.2d 903, 906 (5th Cir.1984); *accord Concourse Beauty School, Inc. v. Polakov*, 685 F.Supp. 1311, 1318 (S.D.N.Y.1988) ("The misconduct must amount to a denial of fundamental fairness of the arbitration proceeding in order to warrant vacating the award." (quoting *Transit Cas. Co. v. Trenwick Reinsurance Co.*, 659 F.Supp. 1346, 1354 (S.D.N.Y.1987), *aff'd mem.*, 841 F.2d 1117 (2d Cir.1988))).

*Tempo Shain Corp. v. Bertek*, Inc., 120 F.3d at 20

122.    In the arbitration below, it cannot be denied that the procedure employed was fundamentally unfair to ARMA.  For example the Tribunal rejected ARMA's demand to seek discovery pertaining to BAES' termination of any other international representative agreements, representatives or agents in 2007 and/or 2008 as a result of the Woolf Commission investigation of BAES.  *See Exhibit "H"*.  The Tribunal's denial of this demand was based upon the statement in BAES' motion that the IRA was extended through March 31, 2008, "mirroring the date set at that time for C-3's performance to be completed".  *See Exhibit "E" @ p. 4*.  Accordingly, BAES argued - and the Tribunal agreed - that the demand was neither necessary nor material.

123.    Although ARMA knew that its termination was not related to the completion of C3, BAES maintained that it was.  In sum, BAES (falsely) took the position that it was necessary to extend the IRA through the completion of C3 in order for ARMA to be paid its commissions.

Accordingly, the Tribunal denied ARMA's request for discovery of facts necessary to disprove BAES' contention.

124.    The Tribunal's refusal to allow ARMA's discovery request proved to be highly prejudicial to ARMA when the Tribunal asked the parties to be prepared to address the question of whether the extension of the IRA was related to the delivery schedule for C3.  At argument, counsel for BAES stated:

> Those [decisions to extend the IRA] were actually due depending on internal reviews at BAES, and the reviews were aimed at determining whether or not they were going to extend the life of the IRA or allow it to expire by its own terms

*See Exhibit "N" @ p. 52.*

125.    As counsel finally admitted at argument that there were, in fact, internal reviews going on at BAES between the end of 2007 and the beginning of 2008, the Tribunal's refusal to grant ARMA's demand for discovery of those internal reviews completely deprived it of the opportunity to prove that the internal reviews were not particular to ARMA but, rather, were as a result of a company-wide decision to terminate all international representative agreements. Discovery on this issue would have, at the very least, served to establish the existence of triable issue of fact as to whether the termination of the IRA was in bad faith as it related to ARMA.

126.    The Tribunal also denied ARMA a right to a fundamentally fair hearing by limiting its demand for discovery of **all** schedules and addenda to the AFDW.  Specifically, at the discovery conference, BAES argued that ARMA's demand was "principally directed" at Schedule 1 of the AFDW, which BAES sought to withhold as purportedly being a "highly confidential document".   ARMA replied that since BAES argued that the AFDW was purportedly missing certain material terms necessary for a "sales contract", the Tribunal would not be able to properly interpret the AFDW unless it was in possession of the **entire** document,

including **all** schedules and addenda, which were described as apparently containing the purportedly missing terms.

127.   In granting only limited discovery, the Tribunal restricted its directive to only Schedule 1 of the AFDW, instead of all schedules.  *See Exhibit "H" @ p.2.*  This ruling also proved to be prejudicial to ARMA insofar as, at oral argument, counsel for BAES argued that BAES and the MOD purportedly did not know any of the specifications of MOKYS at the time the AFDW was executed, contending:

> If you actually look at the AFDW, it tells you that the MOD and BAES
> have to actually sit down and negotiate exactly what the terms of any future
> sales contracts are … its actually figuring out what this product is actually
> going to be.
>
> At the time the AFDW was signed … nobody knew what the final
> requirements and the specific techniques were.  Nobody knew what
> MOKYS was going to look like
>
> [MOD] can't just insist on terms
>
> [MOD and BAES] had to sit down and work together, negotiate back and
> forth, figure out what it is was [sic.] going to be the substance of C1, C2 and
> C3 and once that was actually done…
>
> Then MOD could say 'Okay, now we know what the terms are here that we
> have agreed to.  Here's the contract, it's time for you to sign

*See Exhibit "N" @ p. 35-37.*

128.   This representation was completely false, insofar as the tender process required all applicants to build and demonstrate a "proposed solution" for MOKYS.  *See, e.g., Exhibit "S".*  Further, Section 3.1.9 of the AFDW describes a "technical specification for the MOKYS SR project", which was referenced as being attached as schedule 2 to the AFDW.  *See Exhibit "U" @ ¶3.1.9.*  Despite due demand for this schedule, the Tribunal inexplicably refused to grant ARMA's request for discovery of same.  Accordingly, ARMA did not have any evidence at oral argument to contradict the unsupported (and, evidently, false) representations of counsel.

129.    Based upon her own self-serving yet false statement that the AFDW was devoid of any specifics regarding the MOKYS Programme, counsel went on to state

> It would be incorrect, in my view, to look at the AFDW and say, yes, this obligated BAES to sell anything that the MOD came and asked for as long as it was on this price list for that particular price.  That's just not how the parties ever operated.  It's not how this agreement is interpreted by, you know, the people who signed on to the agreement … and it's just not how business is done in the industry

*See Exhibit "N" @ p. 49.*

130.    At the time counsel made the foregoing statement as to how the agreement was interpreted by the parties who signed it (those being BAES and the MOD), she knew it to be false or, alternatively, made such representation with a reckless disregard for the truth.  Knowing this to be the case, she quickly reminded the Tribunal that

> ARMA is not a party to the AFDW.  So its opinions on what the AFDW is have to be taken with a grain of salt, because they certainly haven't presented any extrinsic evidence to suggest that our … interpretation of that agreement, is somehow wrong

*Id, @ p. 62.*

131.    The subtle deliberateness of counsel's foregoing statement is a perfect illustration of BAES' immoral conduct in the proceeding below.  Specifically, counsel argued throughout that both the IRA and the AFDW were both plain on their face.  In light of this purported fact, BAES argued that ARMA was not entitled to introduce extrinsic evidence unless and until the Tribunal found that either agreement was ambiguous, since "[a]scertaining whether or not a writing is ambiguous is a question of law for the trial court" (*Morse/Diesel, Inc. v. Trinity Industries, Inc.*, 67 F.3d 435, 443 (2d Cir. 1995) *quoting Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993); *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157 (1990)) and "matters extrinsic to the agreement may not be

considered when the intent of the parties can be gleaned from the face of the instrument." *Teitelbaum Holdings, Ltd. v. Gold*, 48 N.Y.2d 51 (1979).

132.    Accordingly, it can be seen that BAES misused its argument as both a shield and a sword by taking the position that the agreements were unambiguous to prevent discovery and, then, by using that advantage to offer false statements about the agreements knowing that the lack of discovery meant such false statements could not be impeached.

133.    As a result of the foregoing, in its post-argument brief, ARMA urged the Tribunal to disregard any "testimony" of counsel as to the terms of the AFDW and how the "parties", particularly the MOD interpreted it, unless ARMA be given the chance to present witnesses to disprove those statements. *See Exhibit "O" @ p. 7.*

134.    Unfortunately, the Tribunal accepted counsel's arguments over ARMA's objections and found that the AFDW was "only a framework for potential future contracts." *See Exhibit "A" @ p. 8.*   This finding was clearly prejudicial to ARMA as ARMA had no opportunity to cross examine counsel on the basis of her opinions.   Moreover, it denied ARMA the right to present a witness from the MOD (or even from BAES) to contradict this statement. To the extent that counsel's statements formed one of the primary bases for the Tribunal's decision finding that the AFDW was not a Compensable Sale under the IRA, it is clear that ARMA was denied a fair hearing.

135.    In instances such as this, courts have found it appropriate to vacate an arbitral award.  *See, e.g., Hoteles Condado Beach, La Concha and Convention Center v. Union De Tronquistas Local 901*, 763 F.2d 34 (1st Cir. 1985).  In *Hoteles Condado,* there was no live testimony and, as a result, the arbitrator admitted into evidence the transcript of a criminal proceeding that allegedly justified the respondent's discharge of its employee.  After admitting

the transcript wherein testimony was given, however, the arbitrator refused to give any weight to the evidence. The First Circuit found that, although the arbitrator was not bound to accept the findings of the Puerto Rico Superior Court, his refusal to give the evidence that was "central and decisive" **any** weight was sufficient error to warrant vacatur of the award.

136.    In this case, the Tribunal committed a similar (albeit inverse) error. Specifically, there were no witnesses in the proceeding before the Tribunal below and, therefore, there was no testimony. Instead, all that was before the Tribunal were the arguments of counsel. For example, counsel repeatedly offered statements as to the purported interactions between BAES and the MOD, such as:

> If you actually look at the AFDW, it tells you that the MOD and BAES have to actually sit down and negotiate exactly what the terms of any future sales contacts are. And it's not just negotiating terms, it's actually figuring out what this product is actually going to be. *Exhibit "N: @ p. 35.*

> At the time the AFDW was signed, as I mentioned earlier, nobody knew what the final requirements and the specific techniques were. No one knew what MOKYS was going to look like … *Id.*

> There was no guarantee at the time the AFDW was signed that there was ever, ever going to come into existence a binding sales contract… *Id.*

> They had to sit down and work together, negotiate back and forth, figure out what it was going to be *Id, @ p. 36*

> It's not a situation where, okay, here's the price list and MOD comes back, no discussion, and says "Okay, we need a hundred and fifty radios." It just doesn't work like that. That's not how the process is undertaken. *Id. @ p. 43.*

> The MOD has not bound itself to buy [anything]. *Id. @ p. 46.*

> You have to come to the terms, and the terms have to be relied on somehow, and the terms clearly aren't in the AFDW *Id. @ p. 48.*

> Those terms weren't know at [the time the AFDW was signed]. They all had to be negotiated in the future

And that's in fact what happened.  The BAES [sic.] and the MOD sat down, worked out exactly what it was going to be required in order to build out this MOKYS program that made up the requirement  *Id. @ p. 50.*

137.    Although ARMA objected to the Tribunal's acceptance of the disputed statements of purported fact made by counsel for BAES, the Tribunal apparently rejected that request and elected to ascribed them the weight of testimony.  This was evident in the Final Award, where the Tribunal found that "no provision of the AFDW required MOD to buy products or services. *See Exhibit "A" @ p 9.*

138.    To afford statements of counsel the weight of testimony is clearly erroneous; since it was based on mere speculation, was neither verified nor corroborated, and ARMA did not (nor could it) have the opportunity cross-examine the proponent of said testimony as to the veracity of same.

139.    While the rules of evidence and procedure may not apply to the arbitration process, those rules clearly provide guidance when courts are asked to consider the process employed.  For example, Rule 56(e) of the Federal Rules of Civil Procedure provides that "[s]upporting and opposing affidavits shall be made on *personal knowledge,* shall set forth such facts as would be *admissible in evidence,* and shall show affirmatively that the affiant is *competent to testify* to the matters stated therein."  *FRCP 56(e).* A court may strike affidavit statements (1) for which the affiant lacks personal knowledge; (2) that set forth facts inadmissible at of trial; or (3) to which the affiant is not competent to testify. *Id*. The "requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented," and [a]n affidavit based merely on information and belief is unacceptable.  *Judicial Watch, Inc. v. U.S. Dept. of Commerce,* 224 F.R.D. 261, 263 (D.D.C. 2004); *see also Reynolds & Reynolds Co. v. Hardee,* 932 F. Supp. 149, 153 (E.D. Va. 1996) aff'd, 133 F.3d 916 (4th Cir. 1997) (evidence must be based on personal knowledge and set forth admissible facts).

140.   The same is true under New York law, which requires a motion for summary judgment to be based upon affidavits of persons with first-hand knowledge and hearsay affirmations of counsel who have not demonstrated first-hand knowledge are insufficient. *See e.g., Zuckerman v. City of New York*, 49 N.Y.2d 557 (1980); *Otis Elevator Co. v. Heggie Realty Co., Inc.*, 107 Misc.2d 67 (N.Y. Misc. 1980); *Yancy v. Gambee*, 54 Misc.2d 743 (N.Y. Misc. 1967); *Amato v. Lord & Taylor, Inc*. 10 A.D.3d 374 (2d Dept. 2004).

141.   In this case, the arguments of counsel were wholly insufficient to establish any facts with respect to the AFDW, however, the Tribunal summarily resolved those questions in favor of BAES and against ARMA.

142.   In order to mandate vacatur, an evidentiary error in an arbitration proceeding "must be one that is not simply an error of law, but which so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co*., 397 F.2d 594, 599 (3d Cir.), *cert. denied*, 393 U.S. 954 (1968).

143.   In this case, the Tribunal's evidentiary rulings substantially affected ARMA's rights in countless respects.  For example, the Tribunal's refusal to allow ARMA as the Claimant the right to seek the discovery necessary to defend against BAES' motion was prejudicial, particularly when the Tribunal elected to inquire as to the very issues on which ARMA sought discovery at oral argument.  In addition, the Tribunal's refusal to allow ARMA any discovery on its claims-in-chief operated to deny ARMA the right to proceed to a full hearing as such discovery would have, at the very least, raised additional triable questions of fact.  Further, the Tribunal erred in allowing BAES to present what was essentially a sur-reply on its motion, which was introduced to the Tribunal at the commencement of oral argument, purportedly to assist the Tribunal by outlining the arguments that counsel intended to make during the hearing.  Finally,

the Tribunal erred in allowing BAES' unauthenticated and gratuitous post-post argument submission into the record, again without affording ARMA the opportunity to respond in kind. Accordingly, there can be no question that the Tribunal's evidentiary rulings substantially affected ARMA's rights.

144.    For all these reasons, vacatur of the award is not only appropriate, it is required.

## B. The Award was Procured by Fraud and Undue Means

145.    In the proceeding below, the Final Award was procured by fraud and undue means on the part of BAES and, as such, cannot withstand this Court's scrutiny.

146.    The Final Award should be set aside pursuant to 9 U.S.C. §10(a)(1) which provides for vacatur where an award was procured by corruption, fraud, or undue means. *See 9 U.S.C. §10; Geyer Roofing Inc. v. Roofers Local 30B, United Union of Roofers, Water Proofers and Allied Workers*,  736 F.Supp. 573, 578 (D.N.J. 1990) (while courts generally show deference to arbitration awards, they will not enforce awards that are procured by fraud or coercion); *High Concrete Structures, Inc. v. Local 166*, 879 F.2d 1215 (3d Cir. 1989); *Office and Professional Employees International Union v. Washington Metropolitan Area Transit Auth.*, 724 F.2d 1330 (D.C. Cir. 1983); *Arco–Polymers, Inc. v. Local 8–74*, 671 F.2d 752 (3d Cir.), *cert. denied*, 459 U.S. 828 (1982); *Yates v. Yellow Freight System*, 501 F.Supp. 101 (S.D.Ohio 1980); *See also Raiford v. Merrill Lynch, Pierce, Fenner & Smith*, 903 F.2d 1410, 1413 (11th Cir. 1990) (courts cannot vacate an arbitration award unless it is arbitrary or capricious).

147. It is relatively well settled that in order to seek vacatur on these grounds, fraudulent conduct in general will not mandate relief, rather, there must be a nexus between the fraudulent conduct and the panel's decision. *See, e.g., Forsythe Intern., S.A. v. Gibbs Oil Co. of Texas*, 915 F.2d 1017 (5th Cir. 1990). As has been set forth *supra,* BAES' fraudulent (or corrupt) conduct permeated the entire proceeding so much so that there can be no denying the existence of a nexus between the fraudulent conduct and the Final Award.

148. Courts have interpreted the term "undue means" to mean behavior that is "immoral, if not illegal". *See, Conoco, Inc. v. Oil, Chemical & Atomic Workers Intern. Union*, 26 F.Supp.2d 1310 (N.D. Okla. 1998) citing *A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1403 (9th Cir.1992).

### i. BAES' Bad Faith Motion for Summary Judgment

149. In this case, there can be no conclusion other than that the Final Award was procured by clearly immoral conduct. Indeed, when the record is viewed as a whole, it can be seen that BAES sought and obtained a competitive and unfair advantage at every stage of the proceeding, starting at the very outset of the arbitration. For example, BAES' decision to file its motion without first seeking permission approximately one (1) hour before the preliminary scheduling conference was to commence leaves little doubt that the sole purposes of filing the motion were: (i) to delay the proceeding; (ii) to increase costs to ARMA; (iii) to limit the issues under consideration to those enumerated by BAES; and (iv) to limit ARMA's rights to discovery and to present witnesses.

150. The motion itself was based upon arguments that BAES knew to be specious, at best, to the extent it argued that it was the intent of the parties that ARMA was to be paid commissions only on individual Contracts for Work and only on those which came into being

during the term of the IRA. This argument was completely untrue, insofar as BAES repeatedly assured ARMA that it would be paid commissions on the entirety of the MOKYS Programme if it were successful in obtaining the tender for BAES. These were critical facts which ARMA was effectively prevented from demonstrating. In fact, ARMA was deprived of any opportunity to inquire of and/or present any witnesses with regard to these representations, which, if true, are both relevant and material to the issues presented to the Tribunal.

151. Once filing the motion, BAES framed the dispute in such a way that allowed it to argue that the entire case could be decided within the four corners of the IRA. This argument, however, was adopted for the sole purpose of thwarting ARMA's right to seek necessary discovery which, if granted, would have exposed the fraud and misrepresentations of BAES.

### ii. Other Instances of BAES' Immoral or Illegal Conduct

152. In addition, and as was stated above, counsel for BAES made false representations at oral argument concerning the MOKYS Programme by stating that:

> At the time the AFDW was signed … nobody knew what the final requirements and the specific techniques were. Nobody knew what MOKYS was going to look like

*See Exhibit "N" @ p. 35.*

153. The foregoing statement was both false and misleading insofar as both the RPT and, more specifically, BAES' own submitted tender proposal, the "STP", show that in order to win the AFDW, BAES knew exactly what the requirements and final techniques were and, therefore, precisely what MOKYS would "look like". As one can see, the STP included as "Attachment A", confidential and binding price information (in a sealed enclosure) and "Attachment C" (same), a detailed Logistics Support Plan. *See id.*

154.   The sole purpose of counsel's statement was to support BAES' contention that the AFDW was merely "an agreement to agree" with "no legal consequences whatsoever", other than for BAES and the MOD to "negotiate negotiations" [sic.]. *Id. @ p. 35-39.*

155.   These representations had a direct bearing on the Tribunal's decision insofar as the Tribunal adopted that contention in finding that the AFDW was not a Compensable Sale under the IRA.

156.   "Obtaining an award by perjured testimony constitutes fraud". *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1297 (9th Cir. 1982) citing *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594 (3d Cir.) (dictum), *cert. denied*, 393 U.S. 954 (1968); *Shearson Hayden Stone, Inc. v. Liang*, 653 F.2d 310 (7th Cir. 1981).

157.   Another example of the undue means employed by BAES was its contention in the motion for summary judgment that the IRA was extended to March 31, 2008, to 'mirror the expected completion date of C3', intending the Tribunal to conclude that the extension of the IRA was somehow a requisite for ARMA to have been paid commissions on C3.  *See Exhibit "E" @ p. 4.*  BAES was forced to admit at oral argument under direct inquiry from the Tribunal that the extension of the IRA had nothing to do with the expected completion date of C3 but, rather, was related to internal audits going on at BAES at the time.  Based upon the foregoing, the initial representation as made in the motion was unethical and immoral because BAES knew the representation to be false yet made such representation for the sole purpose of being able to argue that ARMA was not entitled to discovery on the facts underlying the decisions to let the IRA expire.  Consequently, when BAES finally admitted its lie at oral argument, ARMA was unable to establish the true reasons for the termination as the admission was by counsel, not by a witness, and ARMA had been denied discovery on that topic.

158.   Again, the fraudulent representations had a direct nexus to the Final Award insofar as the Tribunal held that

> If ARMA expected to receive commissions on the entire MOKYS program solely for helping BAES create a relationship with MOD, it should have negotiated an IRA that reflected that intent … Since ARMA knew that the MOKYS purchases could occur over an eight-year period, it could have negotiated an IRA with a term coincident with the term set forth in the public tender.  It did not.

*See Exhibit "A" @ ¶43.*

159.   Had BAES not fraudulently stated in its motion for summary judgment that the IRA was extended to mirror the completion of C3 but, instead, admitted that the decisions to extend the IRA and/or let it expire were as a result of internal reviews going on at BAES at the time, the Tribunal would have found that ARMA was entitled to discovery as to those facts and circumstances.  In that event, ARMA would have been able to establish that the IRA as drafted did not reflect the actual understanding of the parties but, instead, was intended to cover the entirety of the MOKYS Programme.  As a result, the Final Award was procured by fraud and undue means.  *See, e.g., Dogherra, supra.*

160.   Elsewhere, counsel continued to give false opinions in the form of testimony regarding the AFDW stating:

> I would think of [the AFDW] in terms of a more preliminary agreement [but the] terms weren't known at that time.  They all had to be negotiated in the future.  And that's in fact what happened.  The BAES and the MOD sat down, worked out exactly what it was going to be required in order to build out this MOKYS program that made up the requirement, and those resulted in the C1, C2 and C3 actual binding sales contracts

*See Exhibit "N" @ p. 50*

161.   Knowing these statements to be false and that ARMA would disagree with them, counsel went on to state

> ARMA is not a party to the AFDW.  So its opinions on what the AFDW is
> have to be taken with a grain of salt, because they certainly haven't
> presented any extrinsic evidence to suggest that our … interpretation of that
> agreement, is somehow wrong

*Id. @ p. 61-62*

162.    Against this backdrop, it is relevant to note that counsel opposed ARMA's discovery requests pertaining to the negotiations of the individual Contracts for Work and negotiations for the extension of the AFDW as purportedly being beyond the scope of its motion. *See, e.g., Exhibit "G".*  Accordingly, it can be seen that counsel either specifically orchestrated or otherwise took advantage of the fact that BAES had succeeded in defeating ARMA's demands for relevant discovery to offer false opinions on topics that it knew ARMA could not address.

### iii.  **BAES' Post-Closing Letter**

163.    Finally, and as was noted above, after the record was to have been closed, counsel for BAES submitted a further letter to the Tribunal, purportedly to "update the record".  *See Exhibit "Q".*  The letter, as with nearly all of BAES' other submissions, was filed without seeking permission of the Tribunal.  As to substance, the letter stated:

> [i]t has recently come to our attention that the [MOD] is now in the process
> of considering the purchase of radios not manufactured by [BAES] for
> use/integration with the MOKYS platform …

*See Exhibit "Q".*

164.    Notably, the letter does not provide any details on how the information purportedly came to BAES' attention, or by whom.  Further, the letter purports to describe an uncertain event that will occur, if at all, in the future.  Notwithstanding the foregoing, it is ARMA's understanding that all representations in BAES' post-closing letter are false and were made with the sole intent of misleading the Tribunal on the binding nature of the AFDW.

Unfortunately, once again, ARMA was denied the opportunity to verify any of the representations made in this letter, although the Tribunal included it in the record.

165.   In light of the foregoing, it can be seen that BAES engaged in fraudulent and unethical conduct throughout the entirety of the proceeding below by, *inter alia,* refusing to follow protocol and the rules of the ICDR, as well as making representations which were known to be false or with reckless disregard for the truth.   Moreover, BAES used those misrepresentations affirmatively to ARMA's disadvantage by artificially narrowing the scope of discovery to which ARMA would have otherwise been entitled.   Each and every one of BAES' misrepresentations and unauthorized filings are undeniably related to the Final Award. Consequently, there can be no conclusion other than that BAES procured the Final Award by corruption, fraud and/or undue means.

166.   In light of the foregoing, ARMA acknowledges that the party moving to vacate arbitration award bears the burden of proof (*Jih v. Long & Foster Real Estate, Inc.*, 800 F.Supp. 312, (D. Md. 1992)), namely, that the other party's improper conduct led to the award. *Tassin v. Ryan's Family Steakhouse, Inc.*, 509 F.Supp.2d 585 (M.D. La. 2007).   This burden of proof is substantial and has been likened to a clear and convincing standard.   See, e.g., *Foster v. Turley*, 808 F.2d 38 (10th Cir. 1986).

167.   In this case, although ARMA believes that the substantial evidence in the record when taken as a whole speaks for itself, it nonetheless recognizes that the burden of proof is a heavy one.   Unfortunately for ARMA, additional evidence needed to prove the misconduct of BAES (and/or its counsel) remains in the exclusive custody, possession and control of BAES as a result of the fact that ARMA was permitted only the most limited discovery in the case below. Moreover, insofar as there is no action or proceeding currently pending between the parties, there

is no mechanism by which ARMA could have compelled the production of documents or the appearance of witnesses in advance of submitting the instant Petition.

168.    In cases such as these, if the Court should find that ARMA has not met its initial burden of proof on this Petition, courts have held that limited discovery may be granted for the purpose of establishing the facts of the Petition.

169.    "[D]iscovery in a post-arbitration judicial proceeding to confirm or vacate is governed by the Federal Rules of Civil Procedure, but is available only in limited circumstances, where relevant and necessary to the determination of an issue raised by such an application." *Frere v. Orthofix, Inc.*, 2000 WL 1789641 *4 (S.D.N.Y. 2000) citing *Lyeth v. Chrysler Corp.*, 929 F.2d 891, 898–99 (2d Cir. 1991); *Sanko Steamship Co. v. Cook Industries*, 495 F.2d 1260, 1264–65 (2d Cir. 1973); *National Hockey League Players Assn'n v. Bettman*, 1994 WL 38130, at * * 2, 7 (S.D.N.Y. 1994); *Pollak & Co. v. Shelgem Ltd.*, 1993 WL 248804, at * *1–2 (S.D.N.Y. 1993); *I.A.M. Nat'l Pension Fund Benefit Plan A v. Allied Corp.*, 97 F.R.D. 34, 36 (D.D.C. 1983); *Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 702 (2d Cir. 1978).

170.    In this case, it is respectfully submitted that, in the event the Petition as currently submitted is deemed insufficient, ARMA should be allowed to obtain discovery from BAES at the very least to establish: (i) the rights and obligations of the parties under the AFDW; (ii) All schedules and addenda to the AFDW; (iii) what BAES and the MOD understood of "what MOKYS would look like" at the time the AFDW was signed; (iv) the circumstances under which ARMA was required to sign the IRA; (v) representations made to ARMA concerning its entitlement to commissions under the IRA; and (vi) the circumstances under which BAES resolved to let the IRA expire.

### C.  **The Tribunal was Guilty of Misconduct**

171.  As the Hon. Peter Keeton Leisure observed, "[i]n order to vacate an arbitration award on the ground of arbitrator misconduct, as provided by § 10(c), "[t]he misconduct must amount to a denial of fundamental fairness of the arbitration proceeding...."  *Roche v. Local 32B-32J Service Employees Intern. Union*, 755 F.Supp. 622 (S.D.N.Y. 1991) citing *Transit Casualty Co. v. Trenwick Reinsurance Co., Ltd.,* 659 F.Supp. 1346, 1350 (S.D.N.Y. 1987); *Concourse Beauty School, Inc. v. Polakov,* 685 F.Supp. 1311, 1315 (S.D.N.Y. 1988); *Konkar Maritime Enterprises, S.A. v. Compagnie Belge D'Affretement*, 668 F.Supp. 267, 271–72 (S.D.N.Y. 1987); *Reichman v. Creative Real Estate Consultants, Inc*., 476 F.Supp. 1276, 1285 (S.D.N.Y. 1979) ("the touchstone in considering claims of arbitrator misconduct is 'fairness' "). *Id.*  "In handling evidence an arbitrator need not follow all the niceties observed by the federal courts.  He need only grant the parties a fundamentally fair hearing." *Id., citing Bell Aerospace Company Division of Textron, Inc. v. Local 516*, 500 F.2d 921, 923 (2d Cir. 1974).

172.  In addition, an arbitrator may be guilty of misconduct sufficient to warrant vacatur where s/he prevents a party from introducing relevant evidence and/or refuses to hear same.  *See, e.g., Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847 (5th Cir. 1995).

173.  In this case, when the proceeding is viewed as a whole, the Court must conclude that inasmuch as BAES procured the Final Award by fraud, the Tribunal was guilty of misconduct for creating the environment which permitted it to happen.  Insofar as the grounds giving rise to the misconduct have been discussed extensively throughout the instant Petition, they are merely summarized herein.

174.  The Tribunal was guilty of misconduct in the following regards:

- By allowing BAES to file a motion for summary judgment curtailing ARMA's rights to a hearing.

- By requiring ARMA to address the issues raised in BAES' motion after having only an hour before the initial scheduling conference to review and digest same.

- By limiting discovery to only the issues raised in BAES' motion, when the entire case could have been prepared for a hearing in the same time allocated to the briefing of BAES' motion.

- By specifically asking about the facts and circumstances of BAES' decision to terminate the IRA at oral argument after having specifically denied ARMA's demand for discovery concerning that issue including BAES' termination of all International Representative Agreements in 2007 and 2008 as a result of the Woolf Commission investigation into BAES' practices.

- By allowing BAES to file an impermissible sur-reply at the commencement of oral argument.

- In conducting the oral argument, by engaging counsel and failing to recognize that the breadth of its inquiries necessarily required the testimony of witnesses.

- By allowing BAES again to make an unauthorized, post-hearing submission without affording ARMA the opportunity to respond in kind.

- By adopting the hearsay arguments of counsel as testimony.

- By failing or otherwise refusing to apply Slovak law to its interpretation of the AFDW as is required by that document and then by incorporating counsel's statements in connection therewith as purported findings of fact in issuing the Final Award.

175.    In its most fundamental form, however, the Tribunal was guilty of misconduct by deciding this matter on summary judgment, without so much as an affidavit of facts from any person with first-hand information, let alone the testimony of witnesses.  Indeed, ARMA has found no reported cases which are directly analogous to this case, perhaps because the error is so fundamental that it has evaded the official reporters.

176.    On the facts set forth above, there are more than sufficient grounds to vacate the award on the basis of misconduct.

### D.  **The Tribunal Exceeded its Powers**

177.    Generally speaking, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." ... This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648-649 (1986) citing *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *Steelworkers v. American Mfg. Co.*, 363 U.S. 564 (1960) and *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974). "Arbitrators can 'exceed their powers' under federal arbitration review statute when they fail to meet their obligations, as specified in given contract, to the parties" (*Western Employers Ins. Co. v. Jefferies & Co., Inc.*, 958 F.2d 258 (9th Cir. 1992)) and the power of a court to vacate an arbitration award in labor dispute is limited to question whether the arbitrator exceeded limits of his contractual authority.   See, e.g., *Humble Oil & Refining Co. v. Local Union 866*, 321 F.Supp. 374 (S.D.N.Y. 1970) *affirmed* 447 F.2d 229.

178.    In the case below, although the parties agreed that the IRA was governed by New York law, they also agreed that the AFDW was governed by Slovak law.  *See, e.g., Exhibit "E"; Exhibit "N"; Exhibit "O"*.  Accordingly, the AFDW was required to be interpreted under Slovak law.

179.    Although the Tribunal was required to apply Slovak law to the AFDW, it exceeded its powers by analyzing the AFDW under New York law.  Specifically, the Tribunal began by finding that

> Under New York law, the requirements for an enforceable contract are: (1) at least two parties with legal capacity to contract; (2) mutual assent to the terms of an agreement with reasonably certain' terms; and (3) consideration.

*See Exhibit "A" @ p. 8-9, citing Conception Bay, Inc. v. Koenig Iron Works, Inc.*, 27 Misc.3d 1230(A), 911 N.Y.S.2d 691 (N.Y. Misc. 2010)

180.    The Tribunal then went on to find that although

> [t]he AFDW satisfies all the elements of a binding contract under New
> York law … it is not a Compensable Sale because it does not satisfy the
> definition of an "unconditional sales contract", which is a "contract for sale
> for Products or Services to a Customer".

*Id.*

181.    It is relevant to note that in making this finding, the Tribunal did not cite any New York law defining an "unconditional sales contract" and, instead, merely cited to the IRA itself referencing a "contract for sale for Products or Services to a Customer".

182.    The Tribunal's finding in this regard was in excess of its authority insofar as the Tribunal was required to apply Slovak law, rather than New York law, to the AFDW.  Instead of deriving its authority from the parties' agreement, the Tribunal applied its own notion of justice and, therefore, exceeded its authority.

183.    For all these reasons, the Final Award must be vacated.

## E.   The Tribunal Manifestly Disregarded the Law

184.    As was stated above, in addition to the statutory grounds for vacating an arbitral award under 9 U.S.C. §10, several Circuit Courts recognize an additional common law basis for vacating an arbitration award where the arbitrators manifestly disregarded the law.  *See, e.g., Wise v. Wachovia Securities, LLC*, 450 F.3d 265 (7th Cir. 2006); *Solvay Pharmaceuticals, Inc. v. Duramed Pharmaceuticals, Inc.*, 442 F.3d 471 (6th Cir. 2006); *Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377 (5th Cir. 2004); *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Intern., Ltd.*, 888 F.2d 260 (2d Cir. 1989).

185.    "An arbitration panel acts with manifest disregard if '(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle.'"  *Solvay Pharmaceuticals, Inc. v. Duramed Pharmaceuticals, Inc.*, 442

F.3d 471, 476 (6th Cir. 2006), citing *Dawahare v. Spencer*, 210 F.3d 666 (6th Cir. 2000) quoting

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995); *Glennon*

*v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996).

      186.    Elsewhere, the Court of Appeals for the Fourth Circuit observed

> an arbitrator has acted in manifest disregard of the law if he "disregard[s] or
> modif[ies] unambiguous contract provisions." … Moreover, an award fails
> to draw its essence from the agreement if an arbitrator has "based his award
> on his own personal notions of right and wrong." … In such circumstances,
> a federal court has "no choice but to refuse enforcement of the award."

*Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 235 (4th Cir. 2006), citing *Mo. River Serv.,*

*Inc. v. Omaha Tribe of Neb.*, 267 F.3d 848, 855 (8th Cir. 2001); *Upshur Coals Corp. v. United*

*Mine Workers, Dist.* 31, 933 F.2d 225, 229 (4th Cir.1991); *Int'l Union, United Mine Workers of*

*Am. v. Marrowbone Dev. Co.*, 232 F.3d 383, 389 (4th Cir. 2000).

### i. The Tribunal Manifestly Disregarded the Legal Standard for Summary Judgment Motions

187.    In the case below, the Tribunal recognized the appropriate controlling principles of law, however, it manifestly disregarded that law in granting summary judgment to BAES.

188.    As a starting point, it is noted that the Tribunal acknowledged the applicable legal standard under New York law by finding that "a summary judgment motion should be granted if the movant shows that there is no genuine dispute as to any material fact …"  *See Exhibit "A"*.

189.    When considering the evidence on a motion for summary judgment, it is well settled law that the Tribunal was required to view the evidence presented in a light most favorable to ARMA as the non-movant.  *See Walton v. Albany Community Dev. Agency*, 279 A.D.2d 93 (3d Dept. 2001); *Horth v. Mansur*, 243 A.D.2d 1041 (3d Dept. 1997); *Vaiana v. Vaiana*, 272 A.D.2d 916 (4th Dept. 2000); *Ferguson v. Ozog*, 288 A.D.2d 833 (4th Dept. 2001); *C. K. Rehner, Inc. v. Arnell Constr. Corp.*, 303 A.D.2d 439 (2d Dept. 2003); A*mpolini v. Long Island Lighting Co.*, 186 A.D.2d 772 (2d Dept. 1992).

190.    In applying this principle of law, the Tribunal was also to consider that summary judgment is considered a "drastic remedy" which should not be granted when there is any doubt as to the existence of a triable issue of fact, because it effectively denies a non-moving party his or her day in court.  *See, e.g., Morris v. City of New York,* 21 Misc.3d 758 (Kings Cty. 2008); *Ivanov v. City of New York*, 21 Misc.3d 1148(A) (N.Y. Cty., 2008) ("It is also well settled that, because it effectively denies a non-moving party his or her day in court, summary judgment should not be granted where there is any doubt as to the existence of issues of fact" *citing Sillman v. Twentieth Century Fox Film Corp.*, 3 N.Y.2d 395 (1957)); *Berkowitz v. Fischbein, Badillo, Wagner & Harding*, 9 Misc.3d 1104(A) (N.Y. Cty. 2005) (*same, citing Andre v. Pomeroy*, 35 N.Y.2d 361 (1974); *Pirrelli v. Long Is. R.R.*, 226 A.D.2d 166 (1st Dept 1996)).  The

granting of the motion "is the procedural equivalent of a trial". *Crowley's Milk Co. v. Klein*, 24 A.D.2d 920 (3d Dept. 1965).

191.    As a result, it was not the burden of the Tribunal to resolve issues of fact that arise on a motion for summary judgment but, instead, solely to determine whether a material issue exists in this regard.  If such an issue is present, the Tribunal was required to deny the summary judgment motion.

192.    Elsewhere it has been stated that the court's function on a motion for summary judgment is to determine whether "by no rational process could the trier of facts find for the nonmoving party" *Jastrzebski v. North Shore School Dist.*, 223 A.D.2d 677, 678 (1996).

> To grant summary judgment it must clearly appear that no material issue of fact is presented.  This drastic remedy should not be granted where there is any doubt as to the existence of such issues or where the issue is arguable; issue-finding, rather than issue-determination, is the key to the procedure."

*Sillman v. Twentieth Century Fox Film Corp.*, 3 N.Y.2d 395, 404 (1957).

### ii.   The Tribunal Resolved Disputed Questions of Fact

193.    In the proceeding below, the Tribunal manifestly disregarded the law governing summary judgment motions in New York as there were undeniably questions of fact concerning the parties' intentions and expectations when they entered into the IRA.  Moreover, many of the relevant facts were in the exclusive knowledge of BAES and, as a result, ARMA should have been granted a full and fair opportunity to conduct discovery prior to the time that the Tribunal entertained a motion for judgment on the pleadings, if it were to entertain such a motion at all.

194.    For example, the Tribunal implicitly acknowledged a question fact in the Final Award wherein it stated

> If ARMA expected to receive commissions on the entire MOKYS program solely for helping BAES create a relationship with MOD, it should have negotiated an IRA that reflected that intent … Since ARMA knew that the

> MOKYS purchases could occur over an eight-year period, it could have negotiated an IRA with a term coincident with the term set forth in the public tender.  It did not.

*See Exhibit "A" @ ¶43.*

195.   Specifically, the Tribunal's finding acknowledged ARMA's contention that if the IRA is interpreted under the construction offered by BAES, it would not reflect the understanding of the contracting parties.

196.   In this instance, however, the Tribunal improperly adopted the arguments of counsel for BAES only, upon her statement that

> It's no small thing that the term of the IRA was for two years …
>
> Two years isn't a meaningless term in the IRA.  They tied their right to commissions and their opportunity to earn commissions on those compensable sales to that two-year time period

*See Exhibit "N" @ P. 153-156.*

197.   The Tribunal's adoption of these statements would be reversible error if it were resolving questions of credibility as between two witnesses but, in this case, there was no witness testimony!  The adoption of BAES' construction of the parties' intent was particularly egregious given the fact that ARMA directly disputed that contention and counsel for BAES was forced to admit that her statements as to why the IRA was extended were only speculation.  *See Exhibit "N" @ p. 157.*  Moreover and, again, only when specifically questioned, counsel admitted that the IRA is a standard form agreement used and drafted by BAES and, other than the inclusion of the appendices, there was nothing in the IRA specific to ARMA or Slovakia.  *See Exhibit "N" @ p. 162-163.*  Finally, it should be noted that ARMA did not negotiate the IRA as was suggested by counsel but, instead, was pressured into signing the IRA on essentially "take-it or leave-it" terms at the 11th hour.

198.    Accordingly, the Tribunal was required to find that such a question of fact precluded it from granting the drastic remedy of summary judgment in favor of BAES.  Instead, it erroneously found that "[t]he parties agree that … there are no material facts in dispute."  *See Exhibit "A" @ p. 7.*  In sum, this finding was not only belied by the record, it operated to deny ARMA's right to a fair hearing.

199.    In addition to the foregoing, the Tribunal manifestly disregarded the law by acknowledging a disputed question of fact as to the nature and extent of MOD's obligations under the AFDW but, instead of merely identifying that dispute, it summarily resolved the question of fact.   This was error because the Tribunal resolved this question without taking any evidence or testimony from MOD.

200.    The only party to the motion that arguably speak to the parties' obligations was BAES and, as counsel for BAES stated, "ARMA is not a party to the AFDW.  So its opinions on what the AFDW is have to be taken with a grain of salt…"  *See Exhibit "N" @ p. 61-62.*  In such an instance, where a key fact at issue is in the exclusive knowledge of the moving party (and/or where ARMA was denied the opportunity to seek discovery on that issue), summary judgment should be denied.  *See, e.g., Utica Sheet Metal Corp. v. J. E. Schecter Corp.*, 25 A.D.2d 928 (3d Dept. 1966).

iii.     **The Tribunal Manifestly Disregarded the Law on Contract Interpretation**

201.    In addition to the foregoing, the Tribunal manifestly disregarded the law when deciding that the AFDW was not a "Compensable Sale" under the IRA in the context of BAES' motion for summary judgment.

202.    As was stated above, Section 4.C of the IRA, defines a Compensable Sale by purportedly requiring a "contract of sale".

203.    In its motion, BAES argued that only the individual Contracts for Work are "contracts of sale" since only the individual Contracts for Work actually "move goods from one place to another".

204.    In response, ARMA argued that BAES' isolation of the term "contract of sale" rendered it inconsistent with the balance of the provisions in the IRA which discuss how commissions are to be paid on a Compensable Sale and what ARMA must and cannot do to bring about a transaction which results in a Compensable Sale. For example, the IRA requires that ARMA is required to 'initiate, promote and develop' the transaction that results in a Compensable Sale, however, the preclusive and directly contradicting language of Section 3 and the Appendix prohibit ARMA from participating in any meetings with the MOD during which the Contracts for Work were discussed. As a result, ARMA argued that the term "contract of sale" as it is used in Section 4.C cannot be a reference to the Contracts for Work insofar as it was precluded from 'initiating, promoting or developing' any such transactions. Consequently, ARMA argued that the term "contract of sale" cannot have the purely commercial and limited meaning urged by BAES in its motion.

205.    In support of its argument, ARMA provided the relevant New York law in contract interpretation to the Tribunal which provides

> Under New York law contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Morse/Diesel, Inc. v. Trinity Industries, Inc.,* 67 F.3d 435, 443 (2d Cir. 1995) quoting *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993); *W.W.W. Assocs. v. Giancontieri,* 77 N.Y.2d 157 (1990) (internal quotations and parenthesis omitted).

206.   In this case, counsel for BAES initially compared the AFDW to a "basic ordering agreement", which was described as a non-committal framework used in the United States defense contracting industry (*see Exhibit "E" @ p. 7*), and repeatedly referred to it as such at oral argument.  *See Exhibit "N" @ p. 17, 33, 34, 38, 49, 57, 153*).  Despite its argument in this regard, counsel for BAES could point to nothing but conjecture in attempting to establish that an "Agreement to Conclude a Future Contract" specifically provided for under the Slovak Commercial Code is, in fact, akin to a basic ordering agreement in the United States. Accordingly, the proper inquiry under the governing case law is how the usages and terminology would be understood by a person familiar with the Slovak defense industry.  As a result, the Tribunal's conclusions with respect to the AFDW were entirely unfounded.

207.   With respect to the IRA, "when a contract is capable of being interpreted one of two ways, courts must choose that meaning which gives effect to all the contract's clauses rather than one that renders part of the contract meaningless." *Allendale Mut. Ins. Co. v. Excess Ins. Co., Ltd.,* 992 F.Supp. 271 (S.D.N.Y. 1997) citing *Newmont Mines Limited v. Hanover Ins. Co.* 784 F2d 127 (2d Cir. 1986); *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169 (1973); Restatement (Second) of Contracts § 203(a).

208.     In this case, the Tribunal manifestly disregarded the law by finding that the AFDW could not be a Compensable Sale under Section 4.C of the IRA as a matter of law since that election clearly did not give effect to all of the IRA's express and contradicting language and rendered certain provisions and clauses meaningless.

209.     To the extent that the parties clearly disagreed as to the proper interpretation of the term "contract of sale" as it is used in Section 4.C of the IRA, and to the extent that ARMA's interpretation must have been given the benefit of every favorable inference, the Tribunal should have denied BAES' motion for summary judgment.

210.     Since BAES interpretation would allow it to terminate ARMA, after it acquired the AFDW without consequence, such interpretation would have rendered BAES obligation to pay ARMA commissions under the IRA as meaningless.  As such, this interpretation cannot and should not be condoned.

### iv.  <u>The Tribunal Manifestly Disregarded Slovak Law</u>

211.     Finally, the Tribunal manifestly disregarded the law by improperly finding that the AFDW did not legally bind both parties under the applicable provisions of Slovak law.

212.     As was noted above, when the Tribunal inquired as to the obligations of the MOD under the AFDW, it was directed to Article III and, specifically, to Section 3.1, which provides, *inter alia*:

> The subject matter of this Agreement is the obligation of the Future Supplier and the Future Ordering Part to enter into contracts for work whose subject matter is the obligation of the Future Supplier to deliver the work and material, to perform the works and installation and to provide the services and service within the implementation of individual tasks of the project [MOKYS] by the Future Supplier in accordance with the technical specifications defined in Article 3.1.9 … and the obligation of the Future Ordering Party to pay the price

*See Exhibit "U" @ ¶3.1.*

213.   The Tribunal was also directed to Section 3.2 of the AFDW which provides

The Future Supplier undertakes with the Future Ordering Party that if the Future Ordering Party requests it in writing, it will enter into a Contract for Work for delivery of the subject matter of this Agreement as specified in general in subclause 3.1 of this Agreement with the Future Ordering Party within 30 days from delivery of such request

*Id. @ ¶3.2*

214.   As was noted above, the Tribunal struggled in its interpretation of these clauses, positing that "one interpretation is you have a contract of sale in the AFDW, but you don't have a contract of purchase." *See Exhibit "N" @ p. 48*.

215.   Indeed, the Tribunal found itself perplexed by the language of the AFDW, as was noted above, when one panel member trying to analyze the language of Section 3.1 focused on the use of the word "will" as opposed to "shall" in the relevant clause of the AFDW regarding the MOD's obligations to BAES under the AFDW, positing that

we know that there are distinctions in the words "must", "will", "shall", "may". This is a "will" not a "shall". So, it sounds like they want to do it, and they will do it, but they may not have to do it.

*Id. @ p. 37.*

216.   The Tribunal's focus on this distinction constituted a wholly imperfect discharge of its duties insofar as the analysis employed by the Tribunal is one employed by American courts in statutory construction.  The Tribunal's inquiry further ignored the fact that its focus was on the use of the word "will" in the English translation of the AFDW, and that the language of the AFDW is Slovak and any dispute or discrepancy in the wording between Slovak and English will be resolved in favor of the Slovak. *See Exhibit "S" @ ¶8.9.*  The Tribunal therefore failed to discharge its duties to the parties by not looking to the word used in the Slovak text to determine: (i) if it could be translated either as "will" or "shall"; and (ii) whether the word as used in the Slovak employs a mandatory command in that language.

217.    As the Tribunal continued its inquiry into the obligations of the MOD under the AFDW, counsel for ARMA directed the Tribunal to Section 289 of the Slovak Commercial Code, governing "An Agreement to Conclude a Future Contract", wherein the Code states "[a] pledge to conclude a future contract shall bind one or both parties to conclude, within a certain time, a contract whose subject-matter shall be at least generally specified." *See Exhibit "V" @ §289.*

218.    In response, the Chairman of the Tribunal candidly stated "I don't understand the meaning of that in this context, one or both parties …" *See Exhibit "N" @ p. 117.*  As the discussion continued, it became clear that the Tribunal either did not understand the statute or, otherwise, did not understand its application, as is revealed in the following exchange:

TRIBUNAL:  (*by Ittig*) So, let me get this straight.  You're saying that both the Ministry of Defense and BAES had to do these contracts once they signed the AFDW?

COOPER:     That's what it says.

TRIBUNAL:  (*by Ittig*) But the code talks about one or both

COOPER:     Binds one or both.

TRIBUNAL:  (*by Ittig*) One or the other.  It doesn't talk about winding [sic.] both of them

*Id. @ p. 119.*

219.    Clearly the Tribunal's interpretations demonstrated more than a lack of familiarity or understanding of how the statute operates under Slovak law, it represents a manifest disregard of the express language used.

220.    In the Final Award, the Tribunal found that the AFDW bound BAES to sell products to the MOD, but no provision of the AFDW required MOD to buy products from BAES (*see Exhibit "A" @ p. 9*).  The Tribunal based its finding on the fact that the terms of the public

tender allowed the MOD the right to reduce or expand the scope of the MOKYS Programme, as appropriate.  *See id. @ p. 10.*  In making this finding, the Tribunal manifestly disregarded the governing provisions of Slovak law which were duly before it.  Specifically, Section 283 of the Slovak Commercial Code provides:

> The party advertising the conditions of a tender may neither amend the published conditions, nor cancel the tender, unless this right has been reserved in the published conditions of the said tender, and the amendment or cancellation is published in the same manner that the conditions of the said tender were previously published.

*See Exhibit "V" @ §283.*

221.    In addition, Section 285 of the Slovak Commercial Code also provides that a bid may not be withdrawn unless the conditions of the tender so permit.  *Id. @ §285.*

222.    Finally, Section 287 of the Slovak Commercial Code provides that the party which asked for the submission of bids shall be bound to accept the chosen bid.  *Id. @ §287.*

223.    As a result, although the MOD reserved the right to reduce or expand the scope of the MOKYS Programme, it did not reserve the right to cancel the obligation.  Accordingly, the provisions of the Slovak Commercial Code make clear that the MOD was indeed bound to purchase products and services from BAES and the Tribunal's finding to the contrary manifestly disregarded the applicable law in that regard.

224.    Insofar as the governing law was properly before the Tribunal, the Final Award must be set aside.

225.    As has been set forth herein, there are numerous grounds which require vacatur of the Final Award which was issued not after a hearing but, instead, upon summary disposition of the issues as framed only by Respondent, not by Claimant.  On these facts, the Final Award must be set aside.

## **CONCLUSION**

For all the reasons set forth herein, cause exists to vacate the Final Award issued in the

arbitration below, as it was issued without a hearing and was procured by fraud and undue

means.

Respectfully submitted,

DILWORTH PAXSON LLP

By: /s/  Joshua D. Wolson
Joshua Wolson, Esq. (DC Bar No. 473082)
1500 Market St., Suite 3500E
Philadelphia, PA 19102
Telephone:  (215) 575-7000
Facsimile:  (215) 575-7200

DAVIDOFF HUTCHER & CITRON LLP
Andrew Paul Cooper, Esq.
Jonathan M. Cader. Esq.
200 Garden City Plaza, Suite 315
Garden City, New York  11530
(516) 248-6400

*Counsel for Petitioner*