**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ARMA, S.R.O.,**

      **Petitioner,**

      **v.**

**BAE SYSTEMS OVERSEAS, INC.,**

      **Respondent.**

**Civil Action No.  13-494 (JEB)**

---

## MEMORANDUM OPINION

    This case derives from a contract dispute between Petitioner ARMA, S.R.O., a Slovak Company, and Respondent BAE Systems (BAES), an American defense contractor.  An arbitral Tribunal, convened here in Washington to resolve the disagreement, ruled in favor of BAES. ARMA then filed this action under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*., seeking vacatur of the final award.  ARMA argues that the integrity of the award has been marred by numerous acts of fraud on Respondent's part, as well as misconduct and legal overreach by the members of the Tribunal that issued the award.  BAES objects to all of these claims and asks the Court to confirm the award under Section 9 of the FAA.

    After devoting considerable time to an extensive review of the factual record and the parties' submissions, the Court finds that Petitioner has failed to make even a passable case for vacatur.  In its dogged efforts to delay confirmation of the award, ARMA has made a series of untenable arguments and, even worse, has submitted pleadings rife with misleading statements, significant omissions, and, occasionally, outright misrepresentations.  Disagreeing with Petitioner on all fronts, this Court will deny its petition for vacatur and grant Respondent's request that the award be confirmed.  Given ARMA's egregious behavior, moreover, the Court

will also grant BAES leave to file a motion requesting an award of reasonable attorney fees.

## I.      Background

According to the Petition, for more than a decade international defense contractor BAES relied upon ARMA, a family-owned Slovak relationship-management firm, to promote its reputation in Eastern Europe and to secure inroads with various government ministries.  See ARMA Petition to Vacate (ECF No. 1), ¶¶ 3-4.  In mid-2005, the Slovak Ministry of Defense (MOD) announced a sizable international public tender for the development of a mobile communications system (MOKYS) for its armed forces.  See id., ¶ 5.  ARMA agreed to assist BAES in its efforts to win the MOKYS tender, and on October 14, 2005, the parties concluded an International Representative Agreement (IRA) to reflect this arrangement.  See id., ¶ 6; BAES Answer (ECF No. 11) at 3.

The IRA stipulated that if BAES succeeded in securing the MOKYS tender, it would pay ARMA commissions for all "Compensable Sale[s]" obtained in connection with the project during the lifetime of the IRA.  See Pet., Exh. T (IRA), § 4.A; Answer at 3.  The IRA had an initial term of two years, see Pet., ¶ 6; IRA App'x A, § 1, and provided that after its expiration, BAES would continue to pay commissions on any qualifying "Compensable Sales."  See IRA, § 6.  BAES was ultimately selected as the winning bidder in the MOKYS tender.  See Pet., ¶ 8. In December 2005, BAES and the Slovak MOD entered into an "Agreement for Future Delivery of Work" (AFDW) to design and implement the MOKYS, see id., ¶ 8, which had an initial term of four years.  See Pet., Exh. A (Final Award), ¶ 19.  Following the signing of the AFDW, BAES and the MOD entered into a succession of "Contracts of Work" to deliver specific elements of the MOKYS program, see Pet., ¶ 9, concluding contracts C-1 and C-2 in May of 2006, and contract C-3 in December of 2006.  See Award, ¶ 21.

BAES paid ARMA commissions on all three of these Contracts of Work, <u>see</u> Pet., ¶ 10, and also extended the term of the IRA until March 31, 2008, at which time it expired.  <u>See</u> Award, ¶ 22.  ARMA contends that BAES allowed the IRA to expire and terminated all of its other similar international representation agreements in response to a high-profile corruption investigation.  <u>See</u> Pet., ¶ 10.  Whatever the reason for its decision, BAES took the position that it did not owe ARMA any commissions on Contracts for Work concluded after March of 2008. <u>See id.</u>; Award, ¶ 25.  In December of 2009, BAES and the MOD extended the term of the AFDW for a further four years and continued to enter into Contracts of Work for products and services related to the MOKYS program.  <u>See</u> Award, ¶¶ 24-25.  When BAES refused to pay ARMA a commission on Contract for Work C-4, ARMA commenced the arbitration at issue in this matter.  <u>See</u> Pet., ¶ 11; Award, ¶ 25.

On November 8, 2011, pursuant to the arbitration clause in the parties' IRA, <u>see</u> IRA § 18, ARMA submitted a demand for arbitration to the International Center for Dispute Resolution (ICDR), a division of the American Arbitration Association.  <u>See</u> Pet.,¶ 21; Answer at 3; Award, ¶¶ 3-4.  The parties jointly selected the members of a three-person Tribunal, all experts in the field of arbitration, to preside over the dispute.  <u>See</u> Answer at 4.  At the outset, both parties agreed that the dispute essentially boiled down to a single issue: how to interpret the term "Compensable Sale" in § 4.C of the IRA and whether the AFDW fit that definition, thereby requiring BAES to pay ARMA commissions on all transactions with the Slovak MOD throughout the lifetime of the AFDW.  <u>See</u> Award, ¶¶ 29-31; Pet., Exh. K (ARMA Cross-Motion for Summary Judgment) at 2.  As defined in the IRA, a "Compensable Sale" is "a transaction . . . formalized in an unconditional sales contract," IRA, § 4.C, that must become binding on the parties during the term of the IRA and involves the "sale [of] Products or Services to a

Customer." <u>Id.</u>, § 4.C(3).  ARMA argued that the AFDW satisfied these criteria and BAES

disagreed, submitting that the AFDW was akin to a framework agreement that did not

automatically obligate the Slovak MOD to buy any products or services.  <u>See</u> Award, ¶¶ 30-31.

Both parties asserted that the dispute could be resolved within the "four corners" and

"unambiguous language" of the IRA, without resort to extrinsic evidence of the parties' intent.

<u>See</u> <u>id.</u>, ¶ 33; Pet., Exh. B (ARMA Demand for Arbitration) at 12; <u>see also</u> Pet., Exh. I (ARMA

Letter of June 21, 2012) at 1.

At a preliminary meeting in March of 2012, BAES requested that the dispute be resolved

on summary judgment.  <u>See</u> Pet., ¶ 26.  Following the exchange of various briefings and

motions, and the resolution of a number of discovery-related issues, the three-person arbitral

Tribunal convened in Washington, D.C., to hear oral argument on BAES's motion for summary

judgment.  <u>See</u> <u>id.</u>, ¶¶ 25-36; Award, ¶¶ 5-12.  While the Tribunal set out five questions for the

parties to address at oral argument, it agreed to hear any other arguments the parties wished to

present.  <u>See</u> Award, ¶ 11.  After a further exchange of post-hearing briefings and letters, the

Tribunal issued a Final Award on January 11, 2013, granting summary judgment to BAES and

dismissing ARMA's claims.  <u>See</u> Pet., ¶¶ 37-40.  The Tribunal determined that each party would

bear its own costs and attorney fees, and that the costs of the arbitration would be apportioned

equally.  <u>See</u> Award, ¶¶ 52-53.

In its Petition, ARMA invokes the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, and

requests that the Court vacate the award on various grounds set out in FAA § 10(a).  <u>See</u> Pet.,

¶¶ 17, 114.  Respondent BAES opposes all of ARMA's claims and moves to have the Final

Award confirmed pursuant to 9 U.S.C. § 9.  <u>See</u> BAES Motion to Confirm (ECF No. 12), ¶ 8.

4

## II.     Standard of Review

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, provides for "expedited judicial review to confirm, vacate, or modify arbitration awards," Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 578 (2008), thereby "establish[ing] an alternative to the complications of litigation." Revere Copper & Brass Inc. v. Overseas Private Inv. Corp., 628 F.2d 81, 83 (D.C. Cir. 1980) (internal quotation marks omitted).  As the D.C. Circuit has repeatedly emphasized: "[J]udicial review of arbitral awards is extremely limited," and the courts "do not sit to hear claims of factual or legal error by an arbitrator." Teamsters Local Union No. 61 v. United Parcel Serv., Inc., 272 F.3d 600, 604 (D.C. Cir. 2001) (internal quotation marks omitted); Kurke v. Oscar Gruss & Son, Inc., 454 F.3d 350, 354 (D.C. Cir. 2006).  As a consequence, a party seeking to challenge an arbitrator's award under any of the FAA's limited grounds, see 9 U.S.C. § 10(a), "must clear a high hurdle." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1767 (2010).  Even a serious legal or factual error on the part of the arbitral Tribunal will not, standing alone, justify vacatur of an award.  Id.; see also United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 37-38 (1987).  Rather, "'[i]t is only when [an] arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable.'" Stolt-Nielsen S.A., 130 S. Ct. at 1767 (quoting Major League Baseball Players Assn. v. Garvey, 532 U.S. 504, 509 (2001) (*per curiam*)) (internal quotation marks omitted).  An arbitral award "must be upheld so long as it draws its essence from the [arbitration] agreement." Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union, 589 F.3d 437, 441 (D.C. Cir. 2009) (internal quotation marks omitted). Even if the arbitrators offered no explanation for their decision, the reviewing court must confirm the award so long as "any justification can be gleaned from the record." Kurke, 454

F.3d at 354-55 (internal quotation marks omitted).

Against the backdrop of this extremely narrow standard of review, the Court considers the multiple arguments for vacatur raised by Petitioner, ultimately finding each deficient.

## III.    Analysis

In seeking vacatur here, Petitioner invokes three of the four statutory grounds available in 9 U.S.C. § 10(a), see Pet., ¶¶ 118-83, and proffers an additional common-law ground, claiming that the arbitral Tribunal "manifestly disregarded the law" in rendering its decision.  See id., ¶¶ 184-225.  Respondent BAES moves to confirm the award, disputing each of ARMA's proposed grounds for vacatur.  See Answer at 10-30.  It also raises additional procedural objections to the form of Petitioner's submissions, see id. at 7-9, which the Court can bypass given its ultimate decision.  Finally, BAES requests that it be granted leave to file a motion for an award of attorney fees and costs associated with this federal-court action.  See id. at 31-33. The Court will first address each of ARMA's proposed grounds for vacatur and then conclude with a discussion of attorney fees.

A.  Award Procured by Corruption, Fraud, or Undue Means

The FAA provides that a district court can refuse to enforce an arbitral award when it has been "procured by corruption, fraud, or undue means."  9 U.S.C. § 10(a)(1).  While § 10(a)(1) has not been addressed in any detail by this Circuit, other courts in this District as well as those from outside jurisdictions have laid a sound foundation and set out persuasive guidelines that this Court will take into account in responding to Petitioner's request for relief under this subsection.

Federal courts consistently refuse to vacate an arbitral award under § 10(a)(1) unless the movant's submissions meet three cumulative conditions.  See Bonar v. Dean Witter Reynolds, Inc., 835 F.2d 1378, 1383 (11th Cir. 1988) (collecting cases).  First, the party seeking vacatur

must demonstrate by clear and convincing evidence that its opponent actually engaged in fraudulent conduct or used undue means during the course of the arbitration.  See, e.g., Lafarge Conseils et Etudes, S.A. v. Kaiser Cement & Gypsum Corp., 791 F.2d 1334, 1339 (9th Cir. 1986); Dogherra v. Safeway Stores, Inc., 679 F.2d 1293, 1297 (9th Cir. 1982); see also Owen-Williams v. BB & T Inv. Servs., Inc., 717 F. Supp. 2d 1, 17 (D.D.C. 2010) (plaintiff's failure to provide evidence beyond its own "unsupported, hearsay statements" insufficient to prove fraud). Under this first requirement, ordinary misconduct will not suffice; the alleged fraudulent acts must have been so prejudicial that they effectively denied the opposing party a "fundamentally fair hearing."  See Hayne, Miller & Farni, Inc. v. Flume, 888 F. Supp. 949, 952-53 (E.D. Wis. 1995) (internal citations omitted).  At least one circuit has determined that "fraud" under § 10(a)(1) demands a greater level of impropriety than required to meet the common-law standard.  See Pac. & Arctic Ry. & Navigation Co. v. United Transp. Union, 952 F.2d 1144, 1148 (9th Cir. 1991).  The "undue means" component of § 10(a)(1) sets a similarly high bar, requiring "nefarious intent or bad faith," PaineWebber Grp., Inc. v. Zinsmeyer Trusts P'ship, 187 F.3d 988, 993 (8th Cir. 1999), or conduct that is "immoral, if not illegal."  Conoco, Inc. v. Oil, Chem. & Atomic Workers Int'l Union, 26 F. Supp. 2d 1310, 1320 (N.D. Okla. 1998).

As a second condition, the movant must show that the fraud could not have been discovered before or during the arbitration through the exercise of reasonable diligence.  See, e.g., Lafarge Conseils et Etudes, S.A., 791 F.2d at 1339; Karppinen v. Karl Kiefer Machine Co., 187 F.2d 32, 35 (2d Cir. 1951) (A. Hand, J.).  If the misconduct came to light at some point during the course of the arbitral proceedings, but the movant nevertheless failed to raise its concerns in a timely fashion, it may be deemed to have waived its right to seek vacatur under § 10(a)(1).  See Johnson v. Gruma Corp., 614 F.3d 1062, 1069 (9th Cir. 2010).  Were it

otherwise, parties would have an incentive to hold claims of fraud in reserve and engage in "sandbagging" strategies inimical to the very goals of the FAA.  See id.

As a third and final condition, the alleged misconduct must "materially relate[] to an issue in the arbitration."  Lafarge Conseils et Etudes, S.A., 791 F.2d at 1339; Dogherra, 679 F.2d at 1297.  The movant must demonstrate a causal connection between its opponent's conduct and the outcome of the arbitration.  See, e.g., A.G. Edwards & Sons, Inc. v. McCollough, 967 F.2d 1401, 1403 (9th Cir. 1992) ("statute requires a showing that the undue means caused the award to be given," otherwise federal courts could second-guess an arbitrator's decision based upon meritless arguments not explicitly addressed in an award); Forsythe Int'l, S.A. v. Gibbs Oil Co. of Texas, 915 F.2d 1017, 1022 (5th Cir. 1990) (the phrase "procured by fraud" to be read as "requiring a nexus between the alleged fraud and the basis for the panel's decision").  Courts in this District have also demanded proof that the misconduct or fraud had some bearing on the arbitrator's final decision.  See Owen-Williams, 717 F. Supp. at 17-18 (finding that even if party had made fraudulent misrepresentations in order to secure delay in arbitral proceedings, no proof that this changed outcome of arbitration and so conduct was immaterial); Pigford v. Johanns, 421 F. Supp. 2d 130, 135 (D.D.C. 2006) (unethical misrepresentation as to counsel's bar status not enough to satisfy nexus requirement because no showing that it led to different result); Bryson v. Gere, 268 F. Supp. 2d 46, 50 (D.D.C. 2003) (movant must prove that substantial misconduct actually prejudiced outcome of arbitration).

Here, Petitioner offers numerous arguments for vacatur under § 10(a)(1), all of which are aimed at Respondent BAES's supposedly fraudulent and immoral conduct.  In particular, ARMA claims that: 1) BAES filed a bad-faith motion for summary judgment, thereby "obtain[ing] a competitive and unfair advantage" throughout the course of the proceedings, Pet., ¶¶ 149-151;

2) BAES made multiple misrepresentations and false statements in its written submissions, thereby thwarting ARMA's ability to obtain relevant discovery, see id., ¶¶ 157-59; ARMA Response (ECF No. 16) at 12-14; 3) BAES made further misrepresentations during oral argument, see Pet., ¶¶ 152-56, and offered "false opinions in the form of testimony," see id. ¶ 160; see also Resp. at 14-15, which the Tribunal "improperly adopted" as fact, see, e.g., Pet., ¶ 196-99; and 4) BAES improperly submitted a letter to the arbitral Tribunal after the record had been closed, which contained false information provided for the "sole intent of misleading the Tribunal." Id., ¶¶ 163-64.  Petitioner alternatively asserts that, if it has failed to provide enough proof to demonstrate that the award was procured by fraud or undue means, this Court should grant ARMA additional limited discovery in order to make its case under § 10(a)(1).  See id., ¶¶ 168-70.  The Court takes each claim in sequence.

### 1.  *BAES's "Bad Faith" Motion for Summary Judgment*

ARMA alleges that BAES procured a favorable arbitral decision through "clearly immoral conduct" when it filed an unauthorized motion for summary judgment, Pet., ¶ 149, which was purportedly based upon "arguments BAES knew to be specious." Id., ¶ 150. Petitioner's submissions to this Court appear to reflect two different theories regarding the influence of the motion for summary judgment.

In its initial Petition, ARMA asserts that BAES requested summary judgment "[o]ver ARMA's objection," thereby "den[ying] ARMA the opportunity to proceed to the very hearing contemplated in the arbitration provision contained in the IRA." Id., ¶ 70.  The Petition further contends that BAES's motion had the effect of limiting ARMA's rights to discovery, see id., ¶ 149, and depriving it of a chance to question or present witnesses on the factual representations contained in the motion.  See id., ¶ 150.  Finally, the Petition asserts that the

request for summary judgment effectively narrowed the dispute to "only those [issues] framed by BAES in its motion," id., ¶ 70, such that the "entire case could be decided within the four corners of the IRA." Id., ¶ 151.

By contrast, in its subsequent Response brief, ARMA changes its story, claiming that its "primary objection" to BAES's motion for summary judgment was that it was "predicated on lies" and contained multiple false representations.  See Resp. at 11-12.  Because this second line of argument is largely duplicative of Petitioner's other allegations of fraud and undue means based upon the purported misrepresentations in BAES's written submissions, see Section III(A)(2), infra, this section will be limited to Petitioner's original claims of procedural impropriety.

Although ARMA may have been unhappy with BAES's initial request for summary judgment, Petitioner has not provided a colorable basis for this Court to conclude that Respondent's conduct prejudiced the outcome of the arbitration in any way.  Indeed, the Petition omits certain critical details apparent in the record, demonstrating that ARMA not only had ample opportunity to object to the resolution of the dispute on summary judgment, but it actually encouraged the Tribunal to so resolve the case.  Its position here would thus cause the most jaded cheek to blush.

On the same day that BAES submitted its motion, the arbitral Tribunal issued a "Case Management Order," see Pet., Exh. F (Case Mgmt Order of Mar. 7, 2012), in which it directed the parties to confer on whether either oral argument or testimony should be heard prior to a decision on the merits.  See id., ¶ 4.  The Tribunal also offered the parties an opportunity to convene for a second preliminary hearing if needed.  See id., ¶ 5.  In the following months, ARMA repeatedly avowed that there were no material facts in dispute and that the case could be

resolved through an interpretation of the parties' contract on summary judgment.  <u>See, e.g.</u>, June 21 Letter at 1 ("[D]uring the course of our preparation of our Memorandum in Opposition to the Motion of Respondent BAES including, but not limited to, our review of the recently produced discovery, it became apparent to us that this case may, in fact, be fully decided by motion."); Pet., Exh. J (Procedural Order No. 2), ¶ 1 ("[T]he parties have concluded the case can be fully decided by motions for summary judgment and ARMA intends to file a cross-motion for summary judgment"); ARMA Cross-Mot. for Summ. J. at 2 ("The instant case is not complicated and essentially asks the Panel to determine only one question"); <u>id.</u> at 4 n. 2 ("ARMA agrees that the claims herein are likely ripe for summary adjudication"); Award, ¶¶ 27, 29, 33.  At one point, ARMA even went so far as to request that the Tribunal dispense with oral argument altogether and decide the merits using only those materials provided in the parties' briefs.  <u>See</u> Mot., Exh. 1 (ARMA Letter of Aug. 27, 2012) at 1-2 (expressing a preference to forgo oral hearings for financial reasons and noting that "oral argument may not be necessary . . . since the competing motions are both based entirely on facts in the record . . . and involve questions of law").

In light of Petitioner's own repeated affirmations that the matter could be decided on summary judgment, it is surely ironic to now see ARMA cry foul and accuse BAES of fraud. Irony aside, however, ARMA's submissions also fail to meet the remaining requirements of § 10(1)(a).

Even if BAES's request for summary judgment were improper, ARMA cannot demonstrate that the supposed "fraud" was not reasonably discoverable during the course of the arbitration.  <u>See, e.g.</u>, <u>Karppinen</u>, 187 F.2d at 35; <u>Lafarge Conseils et Etudes, S.A.</u>, 791 F.2d at 1339.  Petitioner had multiple opportunities to raise objections to both the form and substance of

Respondent's motion, but it chose not to do so.  Were the Court to intervene on this score at such

a late stage, it would effectively reward Petitioner for sleeping on its rights and engaging in the

very type of delaying tactics that other courts have cautioned against.  See Johnson, 614 F.3d at

1069.

Additionally, Petitioner has not provided any showing of a nexus between BAES's

motion for summary judgment and the final outcome of the arbitration.  See, e.g., Owen-

Williams, 717 F. Supp. at 17-18.  From an early stage in the proceedings, both litigants

acknowledged that the dispute turned upon questions of law that could be resolved through a

plain-language reading of the contract.  See ARMA Demand for Arbitration, ¶¶ 39-44; see also,

e.g., ARMA Cross-Mot. for Summ. J. at 2 ("The instant case is not complicated and essentially

asks the Panel to determine only one question, to wit: "what constitutes a 'Compensable Sale'

under the International Representative Agreement entered into by the parties?"); ARMA Aug. 27

Letter at 2.  Indeed, ARMA's initial demand for arbitration confirms that there was only one

issue at the crux of the dispute – namely, whether the AFDW could be categorized as a

"compensable sale" as defined in IRA § 4.C.  Given these clear and consistent representations

throughout the record, there is nothing to suggest that BAES's motion for summary judgment

had the effect of unfairly narrowing the issues in dispute, denying ARMA its right to a full

hearing, limiting ARMA's ability to obtain relevant discovery and to cross-examine witnesses, or

of having any of the other prejudicial impacts of which Petitioner now complains.  Absent any

showing of a link between the purported "fraud" and the outcome of the arbitration, Petitioner's

request on this ground must be denied.

2.   *Purported Misrepresentations in BAES's Briefings & Oral Argument*

ARMA next argues that BAES procured a favorable outcome in the arbitration by

resorting to perjury during oral argument and making factual misrepresentations in its written briefings.  See Pet., ¶¶ 152-62.  While perjury during the course of arbitral proceedings might very well justify vacatur of an award, in this case none of the disputed statements and representations appears to rise anywhere near that level.  Neither party testified under oath or submitted affidavits, and much of BAES's so-called "perjured testimony," id., ¶¶ 152-56, appears to be little more than opinion statements on the matter of contractual interpretation.  Here again, regardless of whether these accusations have any merit, ARMA cannot show that the remaining conditions for vacatur under § 10(1)(a) have been satisfied.

Petitioner contends that during oral argument, counsel for BAES "made false representations . . . concerning the MOKYS Programme" when she noted: "'At the time the AFDW was signed . . . nobody knew what the final requirements and specific techniques were.  Nobody knew what MOKYS was going to look like.'"  Id., ¶ 152 (quoting Exh. N (Oral Hearing Transcript) at 35).  According to ARMA, this "statement was both false and misleading" and was tantamount to "perjured testimony," see Pet., ¶¶ 153, 156, because it belied facts apparent from BAES's tender proposal for the MOKYS program.  Id., ¶ 153.  In support of these claims, Petitioner points out that BAES's tender proposal included "binding price information" and a "detailed Logistics Support Plan," id., thus demonstrating that BAES did "kn[ow] exactly what the requirements and final techniques were and therefore, precisely what MOKYS would 'look like.'"  Id.

Notwithstanding differences of opinion as to what was known or unknown at the time of the tender submission, Petitioner cherry-picks from the record and misconstrues the context in which BAES's counsel's statement was made.  The transcript reveals that, when counsel for BAES stated that "nobody knew what the final requirements and . . . techniques [were] . . . going

to look like," she simultaneously acknowledged that the tender included a "value-based price list" to govern the future relationship under the AFDW.  See Transcript at 35.  Thereafter, much of the oral argument was devoted to the relevance of this price list and whether it meant that the AFDW qualified as a "compensable sale" for purposes of the IRA.  See, e.g., id. at 35-50 (discussing whether AFDW obligated BAES to supply goods to MOD upon demand at prices supplied in tender); id. at 89-137 (Tribunal soliciting ARMA's opinions on whether technical specifications and pricing terms within AFDW rendered it sufficiently binding on BAES to create a "compensable sale").  As a consequence, even if BAES's statements as to its knowledge of the final MOKYS program were false, this "fraud" would have been easily discoverable during the arbitration.  See, e.g., Karppinen, 187 F.2d at 35; Lafarge Conseils et Etudes, S.A., 791 F.2d at 1339.

Furthermore, counsel for ARMA specifically informed the Tribunal that it felt BAES's representations were inaccurate, stating that it wished to "clarify some of the issues, statements and misstatements that [it thought] were made, . . . not suggesting anything was done to deceive."  See Transcript at 89.  Later on during oral argument, counsel for ARMA returned to this point, offering the Tribunal its own views as to the relevance of technical and pricing terms within the AFDW and characterizing BAES's representations as inaccurate.  See id. at 137 ("To refer to the scope of the MOKYS system as completely unknown at the time of the tender is not accurate.").  The Court repeats that "where the fraud or undue means is not only discoverable, but discovered and brought to the attention of the arbitrators, a disappointed party will not be given a second bite at the apple."  A.G. Edwards & Sons, Inc., 967 F.2d at 1404.

In another instance, Petitioner argues that counsel for BAES gave "false opinions in the form of testimony," see Pet., ¶ 160, when she suggested that the AFDW was akin to "a more

preliminary agreement," the specific terms of which had to be negotiated in future binding sales

contracts.  Id. (quoting Transcript at 50).  According to Petitioner, BAES "[knew] these

statements to be false and that ARMA would disagree with them."  See Pet., ¶ 161.  Tellingly,

Petitioner does not provide a scintilla of evidence to demonstrate that BAES's so-called "false

opinions" regarding the AFDW were inaccurate, much less fraudulent, as required under

§ 10(a)(1).  See, e.g., Lafarge Conseils et Etudes, S.A., 791 F.2d at 1339; Dogherra, 679 F.2d at

1297.  But even if it had made a passable showing of fraud, Petitioner's own argument

demonstrates that the remaining requirements for vacatur have not been met.  By acknowledging

that ARMA disagreed with BAES's statement during oral argument, see Pet., ¶ 161, Petitioner

also implicitly recognizes that the supposed fraud was not only discoverable, but actually

discovered, during the course of the arbitration. See A.G. Edwards & Sons, Inc., 967 F.2d at

1404.

        Petitioner's third and final claim of false representations is similarly unavailing.  ARMA

submits that BAES wrongfully "contend[ed] in the motion for summary judgment that the IRA

was extended to . . . 'mirror the expected completion date of C3', intending the Tribunal to

conclude that the extension of the IRA was somehow a requisite for ARMA to have been paid

commissions on C3."  See Pet., ¶ 157 (quoting Exh. E. (BAES Motion for Summary Judgment)

at 4); see also Resp. at 11 ("BAES argued in its motion that the IRA was extended to 'mirror the

completion of the C3'").  As proof of BAES's fraud, Petitioner thereafter explains that "BAES

was forced to admit at oral argument under direct inquiry from the Tribunal that the extension of

the IRA had nothing to do with the expected completion date of C3," see Pet., ¶ 157, and that

"BAES finally admitted its lie at oral argument."  Id. (not citing any part of record); see also

Resp. at 11.

There are two major flaws in this line of argument.  First, it is rather disturbing to note that Petitioner twice misquotes BAES's summary judgment brief in order to allege fraud.  See Pet, ¶ 157; Resp. at 11.  The motion for summary judgment did not state that the IRA was extended "to 'mirror the expected completion date of C3,'" as ARMA now suggests.  Pet., ¶ 157.  Rather, it contained the following "undisputed fact," which is worth quoting in full: "IRA Amendment 2 was executed on January 21, 2008, extending the IRA until March 31, 2008 and mirroring the date set at that time for C-3's performance to be completed."  See BAES Mot. for Summ. J. at 4 (emphasis added).  Petitioner's misquote of the text arguably changes the meaning, making it seem as though Respondent wanted the Tribunal to believe that the IRA was extended for the sole purpose of matching the timeline of the C-3, something that the text does not actually support.  But even if ARMA had represented the record fairly, its request for vacatur would still be unjustified.  If Petitioner's own submissions are taken at face value, not only was the supposed "fraud" discoverable during the arbitration, see A.G. Edwards & Sons, Inc., 967 F.2d at 1404, it was actually discovered when BAES "finally admitted its lie at oral argument."  See Pet., ¶ 157.

Petitioner equally fails to demonstrate any nexus between the purported fraud and the outcome of the arbitration.  ARMA suggests that BAES's misrepresentation resulted in a denial of relevant discovery as to the true reasons for the expiration of the IRA, thereby robbing ARMA of any chance "to establish that the IRA as drafted did not reflect the actual understanding of the parties, but instead, was intended to cover the entirety of the MOKYS programme."  Id., ¶ 159.  Petitioner's nexus argument requires three inferential leaps, none of which can be justified.  First, the Court would have to be convinced that, absent BAES's supposed misrepresentation, the arbitral Tribunal would have reopened discovery.  Second, the Court would need to accept that

further discovery would have produced additional, concrete information as to the meaning of the term "compensable sale" in § 4.C of the IRA.  Finally, the Court would need to find that this additional information would have led to a different outcome in the arbitration.  See, e.g., Owen-Williams, 717 F. Supp. 2d at 17-18; Pigford, 421 F. Supp. 2d at 135.

ARMA's nexus argument fails at step one.  Following the submission of BAES's motion for summary judgment, ARMA requested and was granted discovery of all "[l]etters, memoranda, emails, correspondence or other documents . . . pertaining to the extension of the IRA, as well as pertaining to the expiration of the IRA."  See Pet., Exh. H (Procedural Order. No. 1) at 3, ¶ 5(j).  Having obtained this discovery, ARMA later wrote to the Tribunal confirming its intention not to supplement its cross-motion with exhibits and documents other than those already produced.  See ARMA June 21 Letter at 1.  Thereafter, ARMA stipulated the very "undisputed fact" that it now re-styles as a fraudulent misrepresentation by BAES.  See ARMA Cross-Mot. for Summ. J. at 9-10.  Finally, during the oral hearing, ARMA was given an opportunity to address the extension of the IRA relative to the C-3.  See Transcript at 166.  At no point did ARMA object to BAES's portrayal of the IRA extension or request further discovery, despite the fact that the Tribunal gave the parties the chance to address any unresolved issues and to submit post-hearing briefs on previously undisclosed documents.  See id. at 167-69, 172.

Petitioner has provided absolutely no indication of how BAES's portrayal of the IRA extension succeeded in deceiving the Tribunal and shaping its rulings on discovery.  On the contrary, the Tribunal actually awarded discovery on this matter, and ARMA appears to have found the materials it received to be sufficient.  See ARMA June 21 Letter at 1.  ARMA failed to request any additional documents, even though the Tribunal generally showed itself to be amenable to such requests, including by keeping the factual record open for several weeks after

the oral hearing.  <u>See</u> Transcript at 172.  Had there been any additional, discoverable information

that would have changed the course of the arbitration, it is reasonable to assume that ARMA

would have requested it.  This Court cannot vacate an award on the mere speculation that

Petitioner would have been denied something that it never asked for, despite multiple

opportunities to do so.

### 3.  *BAES's Post-Closing Letter*

Petitioner also suggests that vacatur is appropriate under § 10(a)(1) because BAES

engaged in "fraudulent and unethical conduct" when it submitted an unauthorized letter to the

Tribunal after the factual record had already been closed.  <u>See</u> Pet., ¶¶ 163-65.  According to

Petitioner, this letter, which addressed the Slovak MOD's purchase of radios from a third-party

supplier, contained false information that "ARMA was denied the opportunity to verify."  <u>See</u>

Pet., ¶ 164.

Here again, Petitioner offers no proof that either the content or the form of the letter

amounted to fraud or undue means for purposes of § 10(a)(1).  ARMA merely argues that the

representations in the "post-closing letter are false and were made with the sole intent of

misleading the Tribunal."  <u>Id.</u>  Regardless of any falsity in the content of the letter, Petitioner

cannot demonstrate that this alleged fraud was not discoverable at the time of the arbitration, <u>see,</u>

<u>e.g.</u>, <u>Karppinen</u>, 187 F.2d at 35; <u>Lafarge Conseils et Etudes, S.A.</u>, 791 F.2d at 1339, or that it had

any bearing on the end result of the arbitration.  <u>See, e.g.</u>, <u>Owen-Williams</u>, 717 F. Supp. 2d at 17-

18.  Although it may be that ARMA was unable to verify the representations of the letter, the

Tribunal gave Petitioner the opportunity to respond and to raise its concerns about BAES's

claims, <u>see</u> Award, ¶ 14, and ARMA did so.  <u>See</u> Pet., Exh. R (ARMA Letter of Dec. 7, 2012).

Consequently, the supposed fraud could have been detected through reasonable diligence during

the arbitration itself.  There is also nothing to suggest that the content of BAES's post-closing letter influenced the Tribunal's decision.  The final award places absolutely no weight upon BAES's letter, and instead was decided solely "based upon the language of the IRA and applicable law."  <u>See</u> Award, ¶ 34.  This Court is not at liberty to make assumptions as to the arbitral Tribunal's logic; indeed, an award must be confirmed even where the reasoning is "deficient or non-existent," provided that "any justification can be gleaned from the record." <u>Kurke</u>, 454 F.3d at 354-55 (internal quotation marks omitted).  Here, the Tribunal has produced a reasoned and complete award with more than enough basis in the record to justify confirmation. Petitioner's request for vacatur on this ground is consequently denied.

### 4. *ARMA's Request for Additional Discovery*

As a final gambit, Petitioner submits that, should the Court not find that ARMA has met its burden in proving fraud or undue means under § 10(1)(a), ARMA should nevertheless be granted limited discovery in order to do so.  <u>See</u> Pet., ¶¶ 167-70.   It specifically requests discovery on the following points:

> (i) the rights and obligations of the parties under the AFDW; (ii) All schedules and addenda to the AFDW; (iii) what BAES and the MOD understood of "what MOKYS would look like" at the time the AFDW was signed; (iv) the circumstances under which ARMA was required to sign the IRA; (v) representations made to ARMA concerning its entitlement to commissions under the IRA; and (vi) the circumstances under which BAES resolved to let the IRA expire.

<u>See</u> Pet., ¶ 170.

As an initial observation, the Court notes that all of the above items appear to either duplicate or substantially overlap with discovery requests already addressed by the arbitral Tribunal, the majority of which it granted.  <u>See</u> Pro. Order No. 1, ¶ 4(a)-(o).  For reasons discussed at length below, this Court is not empowered to second-guess the procedural decisions

of arbitrators.  See Section III(B), *infra*.  But even if it were, the Court still could not in good

conscience authorize Petitioner to hold up confirmation of the award and go on an unjustified

fishing expedition on the mere chance that it might turn up more ammunition.  ARMA is correct

in suggesting that a district court may award further discovery in a post-arbitration vacatur

proceeding, see Pet., ¶ 169 (quoting Frere v. Orthofix, Inc., No. 99-4049, 2000 WL 1789641, at

*4 (S.D.N.Y. Dec. 6, 2000)), but only where such discovery is "relevant and necessary to the

determination of an issue raised by such an application."  Frere, 2000 WL 1789641, at *4

(internal citations omitted).  Moreover, when the requested discovery relates to allegations of

fraud, as is the case here, a district court should only entertain a movant's request if the alleged

fraud was not discoverable during the arbitration itself.  See O.R. Sec., Inc. v. Prof'l Planning

Assocs., Inc., 857 F.2d 742, 749 (11th Cir. 1988); Thomas Kinkade Co. v. Hazlewood, No. 06-

7034, 2007 WL 217384, at *2 (N.D. Cal. Jan. 25, 2007).  As already discussed at length above,

Petitioner's own arguments and records have made it abundantly clear not only that each of the

allegedly fraudulent acts and representations was discoverable during the course of the

arbitration itself, but that the majority of these instances were actually "discovered" during the

course of the arbitration and either brought to the Tribunal's attention or addressed at length at

oral argument.  The Court, accordingly, must view ARMA's discovery request as yet another

delaying tactic that must be denied.

     B.  Arbitrator Misconduct

     Petitioner next invokes § 10(a)(3) of the FAA, alleging that the arbitral Tribunal

committed misconduct for many of the same reasons already raised under the heading of "fraud

and undue means."  In a poorly substantiated argument that reads more like the screed of a

conspiracy theorist than a well pleaded complaint, ARMA informs the Court that it "must

conclude that inasmuch as BAES procured the Final Award by fraud, the Tribunal was guilty of misconduct for creating the environment which permitted it to happen."  <u>See</u> Pet., ¶ 173; <u>see also</u> Resp. at 15-16.  While Petitioner's primary contention seems to be that the Tribunal's decision to entertain summary judgment amounted to misconduct, <u>see</u> Pet., ¶ 175, it offers a litany of other supposed misdeeds, which it purports to have "discussed extensively throughout" its Petition. <u>Id.</u>, ¶ 173.  To quote the Petition at length, the Tribunal allegedly committed misconduct:

- By allowing BAES to file a motion for summary judgment curtailing ARMA's rights to a hearing.
- By requiring ARMA to address the issues raised in BAES' motion after having only an hour before the initial scheduling conference to review and digest same.
- By limiting discovery to only the issues raised in BAES' motion, when the entire case could have been prepared for a hearing in the same time allocated to the briefing of BAES' motion.
- By specifically asking about the facts and circumstances of BAES' decision to terminate the IRA at oral argument after having specifically denied ARMA's demand for discovery concerning that issue including BAES' termination of all International Representative Agreements in 2007 and 2008 as a result of the Woolf Commission investigation into BAES' practices.
- By allowing BAES to file an impermissible sur-reply at the commencement of oral argument.
- In conducting the oral argument, by engaging counsel and failing to recognize that the breadth of its inquiries necessarily required the testimony of witnesses.
- By allowing BAES again to make an unauthorized, post-hearing submission without affording ARMA the opportunity to respond in kind.
- By adopting the hearsay arguments of counsel as testimony.
- By failing or otherwise refusing to apply Slovak law to its interpretation of the AFDW as is required by that document and then by incorporating counsel's statements in connection therewith as purported findings of fact in issuing the Final Award.

<u>See</u> Pet., ¶ 174.

Before addressing these arguments, the Court will first review the exacting standard that a party must meet in order to show Tribunal misconduct.  The FAA authorizes vacatur of an award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon

sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). In rendering an award, however, arbitrators are not obliged to "follow all the niceties observed by the federal courts" and have substantial procedural discretion. <u>Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 481 F.3d 813, 816 (D.C. Cir. 2007) (internal quotation marks omitted). As long as the arbitrators "grant the parties a fundamentally fair hearing" and avoid materially prejudicing the litigants' rights, the reviewing court cannot vacate the award for reasons of misconduct. <u>Id.</u> at 816-17 (internal quotation marks omitted).

In general, it is not enough for the party seeking vacatur to complain that the arbitrator made procedural missteps. An arbitrator has substantial leeway to admit any evidence that it finds useful – even hearsay evidence. <u>See</u> <u>Barker v. Gov't Emps. Ins. Co.</u>, 339 F. Supp. 1064, 1067 (D.D.C. 1972). An arbitrator may likewise opt to expedite a proceeding by excluding evidence and testimony that it finds irrelevant or duplicative. <u>See</u> <u>Lessin</u>, 481 F.3d at 817; <u>Fairchild & Co. v. Richmond, Fredericksburg & Potomac Ry. Co.</u>, 516 F. Supp. 1305, 1314-15 (D.D.C. 1981). In certain circumstances, an arbitrator may even have the freedom to limit or bypass oral argument altogether. <u>See, e.g.</u>, <u>In re Arbitration between InterCarbon Bermuda, Lt. & Caltex Trading & Transp. Corp.</u>, 146 F.R.D. 64, 72-73 (S.D.N.Y. 1993); <u>Cearfoss Const. Corp. v. Sabre Const. Corp.</u>, No. 89-1223, 1989 WL 516375, at *3-4 (D.D.C. Aug. 14, 1989).

For the reasons discussed below, none of Petitioner's allegations of misconduct – either individually or in concert – even if factually supported by the record, would amount to a denial of a "fundamentally fair hearing." <u>Lessin</u>, 481 F.3d at 816. Because of the volume and repetitiveness of ARMA's claims, the Court has grouped them into the following categories: 1) the Tribunal's decision to resolve the case on summary judgment; 2) the Tribunal's rulings on

discovery; 3) the conduct of the oral hearing; and 4) other matters of procedure.  The charge that

the Tribunal failed to apply Slovak law to the AFDW, which the Court finds to be utterly

baseless, is fully examined in the section dedicated to Petitioner's allegations that the Tribunal

"manifestly disregarded the law."  <u>See</u> Section III(D), *infra*.

### 1. *Resolution of Dispute on Summary Judgment*

ARMA largely recycles its arguments regarding the summary-judgment proceeding,

already discussed under the heading of "fraud and undue means," <u>see</u> Section III(A), *supra*, to

accuse the Tribunal of misconduct here.  It complains that the Tribunal denied ARMA a

fundamentally fair hearing when it decided the matter "without so much as an affidavit of facts

from any person with first-hand information, let alone the testimony of witnesses."  <u>See</u> Pet., ¶

175.  Even if ARMA had not affirmed, on multiple occasions throughout the arbitration, that

summary judgment was appropriate and that the sole issue in dispute could be resolved through a

reading of the unambiguous language of the contract, <u>see, e.g.</u>, ARMA June 21 Letter at 1; Pro.

Order No. 2, ¶ 1; ARMA Cross-Mot. for Summ. J. at 2, 18; Award, ¶¶ 27, 29, 33, this Court

would still find that resolution of the dispute without a full evidentiary hearing was not improper

nor did it deny ARMA a fundamentally fair hearing.

ARMA states that it has found no reported cases analogous to this one, "perhaps because

the [Tribunal's summary judgment] error is so fundamental that it has evaded the official

reporters." <u>See</u> Pet., ¶ 175.  Petitioner may wish to reevaluate its research strategy.  While the

D.C. Circuit has not addressed this particular question, a number of other courts have found that

the use of summary judgment procedures in arbitration is not fundamentally unfair, <u>see</u> <u>C.</u>

<u>Melchers, GmbH & Co. v. Corbin Associates, LLC</u>, No. 05-349, 2006 WL 925056, at *8-9 (E.D.

Tenn. Apr. 7, 2006), even when the arbitrator has decided to dispense with oral hearings

altogether.  See, e.g., In re Arbitration between Griffin Indus., Inc. & Petrojam, Ltd., 58 F. Supp.

2d 212, 219-20 (S.D.N.Y. 1999); In re Arbitration between InterCarbon Bermuda, Ltd., 146

F.R.D. 64, 72-74 (S.D.N.Y. 1993); Fordjour v. Washington Mut. Bank, No. 07-1446, 2010 WL

2529093, at *6 (N.D. Cal. June 18, 2010).

In an arbitration where the parties were given comparatively less opportunity to develop

their arguments than in the present case, for example, one court found that "[a]s long as an

arbitrator's choice to render a decision based solely on documentary evidence is reasonable," the

"lack of oral hearings does not amount to the 'denial of fundamental fairness' required" to

warrant vacatur.  In re Arbitration between Griffin Indus., 58 F. Supp. 2d at 220.  In another

similar case, a court noted that FAA § 10(a)(3) only "requires an arbitrator to hear evidence that

is 'pertinent and material,'" and an arbitrator's decision to resolve the matter on summary

judgment depends, like that of a judge in a standard civil proceeding, on "the extent to which

issues of fact [are] in dispute."  In re Arbitration between Intercarbon Bermuda, Ltd., 146 F.R.D.

at 72.  Here, Petitioner continuously reassured the Tribunal that there were no material facts in

dispute.  See, e.g., ARMA June 21 Letter at 1; ARMA Cross-Mot. for Summ. J. at 2, 18.  The

Court, consequently, must deny ARMA's request for vacatur on this ground.

### 2.  *The Tribunal's Rulings on Discovery*

In addition to claiming that BAES selectively misrepresented facts in order to deny

ARMA relevant discovery, see Section, III(A)(2), *supra*, Petitioner also accuses the Tribunal of

misconduct for not granting every item on its discovery wish list.  See Pet., ¶¶ 124-28; 174.

Specifically, it complains it was improperly denied access to various confidential addenda that

BAES submitted to the Slovak MOD as part of its MOKYS bid, see id., ¶ 126-28, as well as

various documents pertaining to "BAES' termination of any other international representative agreements . . . as a result of the Woolf commission investigation." Id., ¶ 122.

After a review of the record, the Court finds no reason to question the Tribunal's discovery rulings.  In submitting to arbitration, litigants lose the right to the extensive discovery afforded by the courts.  See Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220, 259 n.18 (1987).  Arbitrators are granted the full authority to determine whether or not certain evidence would prove relevant to their determination.  See Lessin, 481 F.3d at 817.  Under the FAA's extremely limited standard of review for vacatur requests, district courts are not empowered to second-guess such decisions – procedural or substantive – even if there is evidence that the arbitrator erred.  See Stolt-Nielsen S.A., 130 S. Ct. at 1767.  But even if the Court possessed the sweeping powers required to upset the Tribunal's discovery rulings, ARMA's portrayal of the facts does not jive with the very records it submitted.

ARMA was granted discovery of documents in ten of the fourteen broad categories it requested, see Pro. Order No. 1, ¶ 4(a)-(o), receiving partial discovery under two additional categories, see id., ¶¶ 4(e), 4(g), and withdrawing all requests under the final category.  See id., ¶ 4(i).  With specific regard to documents that might have allowed ARMA to "establish . . . [a] triable issue of fact as to whether the termination of the IRA was in bad faith," Pet., ¶ 125, ARMA actually was granted full access to all "[l]etters, memoranda, emails, correspondence or other documents . . . pertaining to the extension of the IRA, as well as pertaining to the expiration of the IRA."  See Pro. Order. No. 1 at 3, ¶ 5(j).  ARMA has not shown that it objected to the Tribunal's denial of discovery of documents related to other IRAs to which ARMA was not a party.  More importantly, it has not adequately demonstrated why such information would have been "pertinent and material to the controversy."  9 U.S.C. § 10(a)(3).

With regard to schedules and addenda to the AFDW, which BAES was obliged to keep confidential pursuant to its agreement with the Slovak MOD, see Pro. Order No. 1, ¶ 4(e), the Tribunal worked to facilitate a solution that would allow ARMA to review certain items *in camera*, see id., and ARMA affirmed that it would be receptive to such an arrangement.  See Pet., Exh. G (Joint Letter of Apr. 20, 2012), ¶ 5.  The fact that the Tribunal did not grant complete discovery for this category of documents is not surprising.  After all, the MOKYS program involved the establishment of a "mobile communication system for [the Slovak] armed forces," see Pet., ¶ 5, and full disclosure of technical specifications likely could have jeopardized matters of Slovak national defense, something that ARMA implicitly acknowledged in its correspondence with the Tribunal.  See Apr. 20 Letter , ¶ 5.

Ultimately, ARMA appears to have been satisfied with the level of discovery it received. Following the parties' discovery conference, ARMA wrote to the Tribunal confirming its intention not to supplement its cross-motion with exhibits and documents other than those already produced.  See ARMA Letter of June 21 at 1.  While Petitioner argues that the "relevance of additional document discovery did not prove itself until the parties were engaged at oral argument," see Resp. at 4, ARMA could have requested such discovery at the close of oral argument, but chose not to.  The Tribunal did not close the record for several weeks after the hearing, and it also gave the parties the opportunity to address any unresolved issues and to submit post-hearing briefs on previously undisclosed documents.  See Transcript at 167-69, 172. If ARMA legitimately believed that additional discovery could have turned the tide of the dispute in its favor, it should have spoken up when it had the chance.

3.   *Conduct of the Oral Hearing*

ARMA's complaints about the conduct of the oral hearing generally focus on the Tribunal's supposed "acceptance of the disputed statements of purported fact made by counsel for BAES," and its willingness to "ascribe[] them the weight of testimony."  See Pet., ¶ 137; see also Pet., ¶ 174.  These statements already form the basis of ARMA's fruitless attempts to accuse BAES of fraud and undue means.  See Section III(A), *supra*.  They variously relate to questions of what was known about the MOKYS at the time the AFDW was concluded, see Pet., ¶¶ 136-37, whether the parties would need to formalize their obligations in subsequent contracts of work, see id., and whether the parties actually believed the AFDW to be fully binding and thus a qualifying "compensable sale" under Section 4.C of the IRA.  See id., ¶¶ 127-34.  Petitioner, however, provides no evidence to show that the Tribunal "accepted [BAES's] arguments over ARMA's objections," id., ¶ 134, "ascribed them the weight of testimony," id., ¶ 137, or relied on them as a basis for its final decision.  See id., ¶ 134.  Petitioner's only argument seems to be that, because it did not get the result it wanted, the only possible explanation must be that the Tribunal elected to base its decision solely on BAES's alleged misstatements and unverified opinions.  See, e.g., Pet., ¶ 137 (Tribunal's decision to ascribe BAES's statements the "weight of testimony . . . was evident in the Final Award, where the Tribunal found that 'no provision of the AFDW required MOD to buy products or services.'") (citing Award at 9).

After a thorough review of the record, including the Tribunal's reasoned Award and the transcript of the oral hearing, the Court can glean no reason to take ARMA's claims seriously. The record demonstrates that the Tribunal allowed the parties ample opportunity to make and rebut arguments, held a routine oral hearing, and ultimately decided the matter "upon the language of the IRA and applicable law," see Award, ¶ 34, and not in reliance on the opinion

testimony of one of the parties.  There is nothing to suggest that the Tribunal denied ARMA a "fundamentally fair hearing" or prejudiced its rights in any way.  See Lessin, 481 F.3d at 816-19.  But even if Petitioner could prove that the Tribunal accepted and relied upon statements made by BAES's counsel during oral argument, this still would not amount to misconduct warranting vacatur.  As another court in this District reasoned when facing an analogous argument: "'[T]he arbitrators appear to have accepted hearsay evidence from both parties, as they were entitled to do.  If parties wish to rely on such technical objections they should not include arbitration clauses in their contracts.'"  Barker, 339 F. Supp. at 1067 (quoting Petroleum Separating Co. v. Interamerican Refining Corp., 296 F.2d 124 (2d Cir. 1961)).

As to Petitioner's other sundry complaints of misconduct by the Tribunal during the oral hearing – namely, the Tribunal's decisions to "ask[] about the facts and circumstances of BAES' decision to terminate the IRA," Pet., ¶ 174, and  to "engag[e] counsel and fail[] to recognize that the breadth of its inquiries necessarily required the testimony of witnesses," id. – the Court finds them so trivial that an extended analysis is not warranted.  The Court recalls that both the ICDR Rules and an abundance of precedent in this Circuit affirm that arbitrators are empowered to set their own procedures so long as the proceedings remain "fundamentally fair" and do not prejudice party rights.  See ICDR IDRP ARB R Art. 16 (en) (2010); Lessin, 481 F.3d at 816-17.

### 4.  *Other Procedural Matters*

Petitioner's other procedural complaints involve the Tribunal's acceptance of various filings from BAES, particularly its willingness to "allow[] BAES [] to make an unauthorized, post-hearing submission without affording ARMA the opportunity to respond in kind," Pet., ¶ 174; see also Resp. at 16-17.  Once again, this argument does not hold water.

The Court notes with displeasure that Petitioner once again misrepresents the plain facts in the record.  ARMA cannot claim that the Tribunal denied it the "opportunity to respond" to BAES's letter, because this is simply not the case.  As the award notes, "ARMA commented on this information in a letter dated December 7, 2012," at which point the Tribunal closed the record.  See Award, ¶ 14.  ARMA itself, in fact, provided this Court with the letter in which it disputed the facts in BAES's post-hearing submission.  See ARMA Dec. 7 Letter.  ARMA also brazenly argues that the Tribunal "cited to [BAES's] letter more than once in its reasoning in the final award," see Resp. at 16; however, Petitioner does not cite to any particular instance in the Award itself, nor can the Court find any.  The Award mentions BAES's post-hearing letter in the section relating to procedural background, see Award, ¶ 14, and makes nothing more of it.  ARMA cannot seriously expect the Court to be persuaded to vacate the Award on the basis of such patently false statements.

C.   Arbitrators Exceeded Their Powers

The FAA provides that the district court located at the seat of an arbitration may vacate an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award . . . was not made."  9 U.S.C. § 10(a)(4).  As with all the other statutory grounds for vacatur, a district court's standard of review is extremely limited and bears repeating.  An error of law or fact – even when serious and outcome determinative – is not enough to justify vacatur.  See Stolt-Nielsen S.A., 130 S. Ct. at 1767.  Rather, it is only when the arbitrator so fundamentally strays from the interpretation and application of the parties' agreement and "dispense[s] his own brand of industrial justice" that the reviewing court may vacate an award.  Id. (internal quotation marks omitted).

In most cases that address the abuse of arbitral powers, the party seeking vacatur alleges

that the arbitrator acted improperly by expanding the scope of the arbitration or ruling on matters

that had not been presented for decision.  See, e.g., Madison Hotel v. Hotel & Rest. Employees,

Local 25, AFL-CIO, 144 F.3d 855, 857-58 (D.C. Cir. 1998) (collecting cases).  Here, however,

Petitioner argues that the arbitral Tribunal exceeded its powers when it made a choice-of-law

error.  ARMA submits that the Tribunal erred when it analyzed the AFDW, the BAES-MOD

contract to which ARMA was not a party, under New York law rather than under Slovak law as

the AFDW required.  See Pet., ¶¶ 177-82.

      As will be discussed further in the section discussing Petitioner's claims of "manifest

disregard" for the law, see Section III(D), *infra*, the assertion that the Tribunal construed the

AFDW under New York law is factually baseless.  Nothing in the Final Award suggests that the

arbitrators disregarded Slovak law and construed the AFDW in accordance with New York law.

The Tribunal, on the contrary, gave significant weight to relevant provisions of the Slovak

Commercial Code as well as to the terms of the public tender for the MOKYS program, finding

them "consistent with the view that BAES [was] bound to sell its products to MOD, but MOD

[was] not required to make purchases for the MOKYS program." Award, ¶¶ 39-40; see also

Transcript at 115-23 (extended discussion of § 289 of the Slovak Commercial Code as applied to

the AFDW).  As a consequence, the Tribunal concluded that the AFDW did not satisfy the

definition of an "unconditional sales contract" in the meaning of IRA § 4.C.  See Award, ¶¶ 36-

38.

      Even if this argument had any merit, the Court still would not be justified in disturbing

the award.  A mistake in choice of law, standing on its own, will not suffice to demonstrate that

an arbitrator exceeded its powers under § 10(a)(4).  See Priority One Servs., Inc. v. W&T Travel

Servs., LLC, 502 F. App'x 4, 5-6 (D.C. Cir. 2013) (possible error in applying Maryland law,

rather than federal law, insufficient to allege arbitrator exceeded powers).  As long as an

arbitrator "was arguably construing or applying the contract, a court must defer to the arbitrator's

judgment" on choice of law, even if the arbitrator gives no explanation for its decision.  Id. at 6

(internal quotation marks omitted); see also United Paperworkers Int'l Union, 484 U.S. at 38;

Madison Hotel, 144 F.3d at 859.  As Petitioner has failed to demonstrate that the arbitrators

departed from the terms of the contract and rendered an award on other grounds, ARMA's

request for vacatur under § 10(a)(4) must be denied.

D.  Manifest Disregard for the Law

In its fifth and final attempt to vacate the Award, Petitioner invokes a non-statutory,

common-law ground that has been recognized in several circuits, maintaining that the arbitral

Tribunal manifestly disregarded the law in reaching its final decision.  See Pet., ¶ 184.  Petitioner

proposes multiple justifications to sustain this challenge, arguing variously that the Tribunal:

1) disregarded the applicable legal standard under New York law when it decided the dispute on

summary judgment, see id., ¶¶ 187-91; 2) improperly resolved certain disputed questions of fact

related to party intent and interpretation of both the IRA and AFDW, see id., ¶¶ 193-200;

3) erroneously found that the AFDW did not qualify as a "Compensable Sale" under the IRA,

see id., ¶¶ 201-10; and 4) ignored Slovak law by finding that the AFDW did not bind the Slovak

MOD to make any specific purchases from BAES.  See id., ¶¶ 211-23.

While the Court ultimately finds all of these arguments wholly unpersuasive, it wishes to

make clear at the outset that it does not express any opinion on whether a litigant may even rely

upon the common-law "manifest disregard" ground to request vacatur of an award.  As several

courts in this District have noted, the Supreme Court recently called the "manifest disregard"

standard into question, observing "that the provisions set forth in 9 U.S.C. § 10 'provide the

FAA's exclusive grounds for expedited vacatur.'" Owen-Williams, 717 F. Supp. 2d at 10 n.7

(quoting Hall Street Assocs., 552 U.S. at 582); see also Regnery Publishing, Inc. v. Miniter, 601

F. Supp. 2d 192, 195 (D.D.C. 2009).  To date, the Supreme Court has  remained equivocal on

this question, musing that "[m]aybe the term 'manifest disregard' was meant to name a new

ground for review, but maybe it merely referred to the § 10 grounds collectively, rather than

adding to them."  Hall Street Assocs., LLC, 552 U.S. at 585.  Since the Hall Street decision,

neither the Supreme Court nor the D.C. Circuit has offered further clarification, and this Court

need not take any position on whether this additional ground remains available.

Assuming, *arguendo*, that ARMA may rely on this ground and reading its pleadings in

the most favorable light, the Court concludes that Petitioner has not provided a shred of evidence

to show that the Tribunal manifestly disregarded the law or, indeed, even erred in its decision.

As the D.C. Circuit has emphasized, "manifest disregard" is "an extremely narrow standard of

review" that requires "'much more than failure to apply the correct law.'"  Kurke, 454 F.3d at

354 (quoting Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175, 1182 (D.C. Cir. 1991)).  In

order to vacate an award for manifest disregard, the reviewing court must first find that the

arbitrators were aware of a governing principle or rule of law, but nevertheless either "refused to

apply it or ignored it altogether."  Kurke, 454 F.3d at 534 (internal quotation marks omitted); see

also LaPrade v. Kidder. Peabody & Co., Inc., 246 F.3d 702, 706 (D.C. Cir. 2001).  The party

urging vacatur bears the burden of making a specific factual showing that the arbitrator

acknowledged and then summarily disregarded an applicable rule.  See Williams Fund Private

Equity Gr. v. Engel, 519 F. Supp. 2d 100, 103 (D.D.C. 2007).  The reviewing court must also

find that the relevant legal principle was "well defined, explicit, and clearly applicable to the

case."  Kurke, 454 F.3d at 534 (internal quotation marks omitted).  It is of no consequence

whether the reviewing court agrees with an arbitrator's reasoning or reading of the applicable law. See id. at 357-58. Even if the arbitrator errs or misapplies the law, the award must be affirmed. See Revere Copper & Brass, Inc., 628 F.2d at 84.

In this case, Petitioner's various claims of manifest disregard seem to be wholly premised upon the fact that the Tribunal reached a final conclusion that was not favorable to ARMA's position in the arbitration. Nowhere does Petitioner provide proof that the Tribunal recognized and then summarily disregarded any clearly applicable principle of New York or Slovak law. Each of Petitioner's arguments is addressed in the sections that follow.

### 1. *Failure to Apply Correct Standard for Summary Judgment*

Petitioner submits that, despite proper identification of the correct summary-judgment standard under New York law, the Tribunal nevertheless refused to apply it, thereby effectively denying ARMA its "day in court." See Pet., ¶¶ 187-92. This argument suffers from several infirmities. First, Petitioner offers no factual support for its claims of manifest disregard. See id. It lectures that "well settled law" obliged the Tribunal to "view the evidence presented in a light most favorable to ARMA as the non-movant." Id., ¶ 189. Petitioner further admonishes that summary judgment is "a 'drastic remedy' which should not be granted when there is any doubt as to the existence of a triable issue of fact." Id., ¶ 190 (additional citations omitted). While this may very well be the standard, at no point does ARMA explain how the Tribunal erred in its application. Brandishing precedent that has no connection to the Tribunal's work is not terribly helpful.

But even if Petitioner saw fit to offer some semblance of a factual argument, its request would still fail on the ground that this Court cannot correct errors in an arbitrator's reasoning, even when he substantially misapplies an established legal standard. See Kurke, 454 F.3d at

357-58.  Rather than demonstrating that the Tribunal acknowledged and then summarily

disregarded the proper standard, <u>see, e.g.</u>, <u>LaPrade</u>, 246 F.3d at 706, Petitioner quibbles only

with the Tribunal's final decision to grant summary judgment.  <u>See</u> Pet., ¶¶ 187, 191 (arguing

that because there were material facts in dispute, the "Tribunal was required to deny the

summary judgment motion").

  As a final observation, this Court is not even convinced that the arbitral Tribunal was

actually required to apply the New York summary-judgment standard in this dispute, though it

might have opted to do so.  The ICDR Rules make plain that, notwithstanding certain limitations,

"the Tribunal may conduct the arbitration in whatever manner it considers appropriate, provided

that the parties are treated with equality and that each party has the right to be heard and is given

a fair opportunity to present its case."  <u>See</u> ICDR IDRP ARB R Art. 16 (en) (2010).  The Rules

make no mention of summary judgment, and they do not direct the Tribunal to apply a particular

standard for this procedure.  Furthermore, although the IRA arbitration clause stipulates that

New York law should be used when construing the substance of the contract, it does not require

arbitrators to adhere to New York's rules of civil procedure.  <u>See</u> IRA § 18.A ("The procedural

rules for such arbitration shall be those of the American Arbitration Association then in effect" –

*i.e.*, the ICDR rules).  This Court consequently does not agree that the Tribunal manifestly

disregarded the law in granting summary judgment to BAES.

### 2.  *Tribunal Resolution of Disputed Questions of Fact*

  In an attempt to get a second bite at the summary-judgment apple, Petitioner next claims

that "there were undeniably questions of fact concerning the parties' intentions and expectations

when they entered into the IRA," and that the Tribunal manifestly disregarded the law by

resolving these questions of fact in favor of BAES.  <u>See</u> Pet., ¶¶ 193-200.  Aside from failing for

all of the reasons discussed in the previous section, Petitioner's argument defies established facts

in its own record.  As already discussed at length, see Sections III(A)(1), (B)(1), *supra*, ARMA

went out of its way to assure the Tribunal that summary judgment was not only appropriate, but

an ideal course of action, given that the dispute boiled down to a narrow question of

interpretation that could be resolved within the four corners of the contract.  It borders on

frivolity for Petitioner to now make accusations of manifest disregard when the Tribunal was

only heeding the mutual requests of both parties.

### 3.  *Misapplication of New York Rules on Contract Interpretation*

In its third argument, ARMA claims that the Tribunal manifestly disregarded New York

principles of contract interpretation when it "decid[ed] that the AFDW was not a 'Compensable

Sale Under the IRA.'"  See Pet., ¶ 201.  To paraphrase, Petitioner argues that the language of

IRA § 4.C was ambiguous and had more than one possible meaning.  See id., ¶¶ 202-06.

Consequently, the Tribunal should have hewed to principles of New York law and selected "'that

meaning which gives effect to all the contract's clauses rather than one that renders part of the

contract meaningless.'"  Id., ¶ 207 (quoting Allendale Mut. Ins. Co. v. Excess Ins. Co., 992 F.

Supp. 271 (S.D.N.Y. 1997)).  The preferable meaning under this principle was, naturally, the one

most favorable to ARMA.  See Pet., ¶¶ 208-10.  Notwithstanding these highly unconvincing

arguments, this Court reminds Petitioner that the "manifest disregard" standard, if available at

all, is not an invitation to revise an arbitrator's errors of law or fact.  As other courts have held in

similar circumstances, this Court finds that so long as it was "legally plausible" for the arbitrators

to find the language of the contract unambiguous, there is no reason to upset the final award.  See

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros, 70 F.3d 418, 421 (6th Cir. 1995).

4.   *Manifest Disregard of Slovak Law*

In its fourth and final argument, Petitioner accuses the Tribunal of "manifestly disregard[ing] the law by improperly finding that the AFDW did not legally bind both parties under the applicable provisions of Slovak Law."  See Pet., ¶ 211.  At the risk of sounding like a broken record, the Court notes that what the Tribunal did or did not find is wholly irrelevant to the inquiry under the manifest-disregard standard.  To allege manifest disregard, the party seeking vacatur must show that the arbitrator recognized and then arbitrarily jettisoned a clearly applicable legal standard.  See Kurke, 454 F.3d at 354.  This is something that Petitioner did not – and, frankly, cannot – prove.  As already noted, see Section III(C), *supra*, the Tribunal devoted an extended portion of the oral hearing to an analysis of the AFDW in light of relevant portions of the Slovak Commercial Code, see Transcript at 115-23, applied these rules, and ultimately found them to be "consistent with the view that . . . MOD [was] not required to make purchases for the MOKYS program."  See Award, ¶¶ 39-40.  Petitioner's request for vacatur must be denied.

E.   Legal Fees

In its Motion to Confirm the arbitral award, BAES also requests that this Court grant it leave to file a motion for an award of reasonable attorney fees and other expenses related to the district court litigation, see Mot. ¶ 9, pointing out that many of ARMA's arguments are "directly contradicted by the record," see Answer at 9, and arguing that it should be punished for engaging in "a very expensive, time-consuming, and utterly baseless campaign to relitigate its entire case in district court."  See Reply at 22.  BAES principally relies upon a decision by Judge Ricardo Urbina of this District, in which he granted a petitioner leave to file a motion for attorney fees in light of the respondent's "fruitless and no doubt expensive efforts to relitigate its claim."

Affinity Fin. Corp. v. AARP Fin., Inc., 794 F. Supp. 2d 117, 123 (D.D.C. 2011).  Contrary to

BAES's contention, Affinity Financial does not afford a persuasive basis upon which this Court

may consider this request.  In that case, the parties sought relief pursuant to both 9 U.S.C. § 10

and the District of Columbia Uniform Arbitration Act, D.C. Code § 16–4423(b).  While the FAA

does not contain any particular provisions for the award of legal fees, the D.C. Act does so, and

Judge Urbina relied on the latter statute in granting leave to file a petition for fees.  See Affinity

Financial Corp, 794 F. Supp. 2d at 123 (citing D.C. Code § 16–4425(c)).  In this case,

conversely, neither party relies upon the D.C. statute.

        This does not put the issue to bed, however.  Federal Rule of Civil Procedure 11(c)(1)

provides that  "a court may impose an appropriate sanction on any attorney, law firm, or party

that violated the rule or is responsible for the violation" of relevant portions of Rule 11(b),

including the obligation to ensure that its representations to the court "are warranted by existing

law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for

establishing new law."  See Fed. R. Civ. P. 11(b)(2).  Other courts have found a party's

representations to be frivolous and thus worthy of sanctions when they are "utterly lacking in

legal merit and evidentiary support."  U.S. ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes

Grp. Inc., 422 F. Supp. 2d 225, 238 (D.D.C. 2006) (internal quotation marks omitted); see also

Animal Welfare Inst. v. Feld Entm't, Inc., No. 03-2006, 2013 WL 1966116, at *11 (D.D.C. Mar.

29, 2013) (noting that litigant's attempts to delay proceedings may justify award of legal fees).

This Court agrees that "the goal of Rule 11 is to 'discourag[e] dilatory and abusive litigation

tactics and eliminat[e] frivolous claims and defenses, thereby speeding up and reducing the costs

of the litigation process.'" Spector v. Torenberg, 852 F. Supp. 201, 211 (S.D.N.Y. 1994)

(quoting McMahon, 896 F.2d at 21.  This is particularly meaningful in light of the fact that the

FAA embodies a "strong federal policy in favor of voluntary commercial arbitration," <u>Revere Copper & Brass, Inc.</u>, 628 F.2d at 83, and was created to "establish an alternative to the complications of litigation." <u>Id.</u>

As this Court has noted throughout its lengthy Opinion, ARMA has made multiple unjustifiable arguments, misrepresented the record, and even attempted to mislead the Court in its efforts to delay confirmation of the award.  As a result, BAES may file a motion for attorney fees and costs that provides its rationale supporting such an award, identifies the party and/or attorneys liable for the award, and supplies documentation proving the particular amounts sought.  Such an award may only encompass the litigation in this Court since the arbitral Tribunal has rejected requests for fees related to the arbitration itself.  <u>See</u> Award, ¶ 52.

## IV.    Conclusion

For the foregoing reasons, the Court will deny Petitioner's request for vacatur and grant Respondent's Motion to confirm the award.  A separate Order consistent with this Opinion will be issued on this day.


<u>/s/ *James E. Boasberg*</u>
JAMES E. BOASBERG
United States District Judge


Date:   August 21, 2013